[Civ. No. 4012. Second Appellate District, Division Two.—October 28, 1925.]

## THE SECURITY COMMERCIAL & SAVINGS BANK OF SAN DIEGO, Respondent, v. SOUTHERN TRUST AND COMMERCE BANK (a Corporation), Appellant.

[1] BANKS AND BANKING—NEGOTIABLE INSTRUMENTS—KNOWLEDGE OF DRAWER'S SIGNATURE — FORGERY — INNOCENT PAYEE—BURDEN OF LOSS.—A drawee bank of a negotiable instrument is chargeable with knowledge of the signature of the drawer, and if the drawee pays upon a forged signature of the drawer, he cannot recover against an innocent payee, if such recovery would result in loss to the payee.

[2] ID.—PAYMENT OF FORGED CHECK—IDENTIFICATION OF PAYEE—LIABILITY OF PAYING BANK—RIGHT OF DRAWEE BANK TO RECOVER.—Where a bank, without inquiry or identification of the person presenting á forged check, purchases it, indorses it generally, and presents it to the drawee bank, which pays it, the latter may recover, if its only negligence is its failure to detect the forgery.

[3] ID.—CHECKS RECEIVED FOR COLLECTION ONLY—LIABILITY OF COLLECTING BANK.—Where a forged check is received by a bank for collection only, and upon presentation to the drawee bank is paid by it, if the drawee bank has honored the check it cannot recover

---

1. See 4 Cal. Jur. 215; 3 R. C. L. 546.

2. Right of drawee of forged check to recover amount paid thereon, note, 12 A. L. R. 1089.

3. Right of drawee of forged check forwarded for collection to recover money paid thereon, note, 12 A. L. R. 1110. See, also, 3 R. C. L. 615.

from the collecting bank which, in reliance upon the act of the drawee, has disbursed the amount required by the payee.

[4] ID.—NEGLIGENCE OF COLLECTING BANK—DRAWEE AND COLLECTING BANKS EQUALLY AT FAULT — REMEDIES. — If the collecting bank alone is culpable, and on account of its negligence only the loss has occurred, the drawee bank may recover; but where the drawee bank alone is at fault it must stand the loss, and where the drawee and collecting banks are equally at fault, the burden will be left where it is found, and the drawee bank cannot recover.

[5] ID.—NEGOTIABLE INSTRUMENTS—INDORSEMENT—LIABILITY OF GENERAL INDORSER — RESTRICTIVE INDORSEMENT. — An indorser, by a general indorsement, warrants to subsequent holders not liable to him that the paper is in all respects what it purports to be, and that he has good title to it and that the signatures of all prior parties are binding upon them as distinguished from a restrictive indorsement, which constitutes the indorsee an agent of the indorser under section 3117 of the Civil Code.

[6] ID.—ASSOCIATION OF BANKS—RULES FOR GOVERNMENT—BINDING EFFECT ON MEMBERS.—Banks may associate themselves together and make rules for their own government, which, as between the members of their association, will supplement, and even supplant the law.

[7] ID.—INDORSEMENT OF CHECKS FOR COLLECTION—CLEARING-HOUSE RULES—INTERPRETATION.—Banks which are members of a clearing-house association are bound by any interpretation agreed upon between themselves as to the effect to be given to a clearing-house stamp indorsement that a check in the hands of one of its members for collection has been "paid."

[8] ID.—CLEARING-HOUSE—DEFINITION.—A clearing-house is an association composed of a number of banks for the convenient and expeditious handling of certain claims and credits against and in favor of members.

[9] ID.—USE OF STAMP CONTAINING WORD "PAID"—CHECKS—INDORSEMENT.—The stamp used by a clearing-house containing the word "paid" is used for clearing-house purposes only and is not a general indorsement when placed upon a check held for collection by a member, but is a conditional receipt to become absolute when the check is honored by the drawee and amounts to an acknowledgment that the drawee has paid the check.

5.  See 19 Cal. Jur. 826; 3 R. C. L. 1148.

6.  See 4 Cal. Jur. 208.

7.  See 4 Cal. Jur. 208.

8.  See 4 Cal. Jur. 207.

9.  Clearing-house transaction as payment or acceptance of checks, notes, 12 A. L. R. 998; 30 A. L. R. 1028.

[10] ID.—CHECKS — COLLECTION THROUGH CLEARING-HOUSE—RULES—
CUSTOM—PRESUMPTIONS.—In an action by a drawee bank to re-
cover the amount of certain forged checks paid by defendant as
a collecting bank, the plaintiff must be presumed to have known
and recognized the usage and custom of banks taking paper drawn
on other banks and passing it through the clearing-house.

[11] ID.—IDENTIFICATION OF PAYEE—SIGNATURE—FINDINGS.—In such
action, the use by the defendant bank of its clearing-house stamp
indicating that said checks had been "paid" was insufficient to
support findings to the effect that defendant by its acts repre-
sented to plaintiff that it knew the payee, that the indorsement
was his genuine signature, and that defendant had identified him.

[12] ID.—CHECKS RECEIVED BY MAIL—CUSTOM—EVIDENCE—FINDINGS.
In such action, the evidence was insufficient to support a finding to
the effect that there was a special custom concerning the manner
in which checks received by mail were transmitted through the
clearing-house and that a failure on the part of the defendant
to comply with it was negligence.

[13] ID.—KNOWLEDGE OF CUSTOM—PRESUMPTIONS.—A custom or usage
which will enter into and affect the rights and liabilities of persons
in their dealings with each other must be certain, uniform, and
either known to those sought to be charged thereby or so gener-
ally known and notorious that knowledge and adoption thereof
must be presumed.

[14] ID.—PAYMENT OF FORGED CHECK — LIABILITY OF HOLDER. — One
having the mere physical possession of a check for collection is not
such "holder" as contemplated by subdivision "g" of section 3266
of the Civil Code, which defines a "holder" as the "payee or in-
dorsee of a bill or note, who is in possession of it, or the bearer
thereof," and the rule concerning the right of a drawee bank as
against the holder to recover money paid by mistake on a check
where the drawer's signature has been forged cannot apply where
recovery is sought against, not a holder, but a bank which has
received the check for collection only.

[15] ID.—CHECKS — PAYMENT EQUIVALENT TO ACCEPTANCE — SECTION
3213, CIVIL CODE.—Section 3213 of the Civil Code provides that
"acceptance must be in writing and signed by the drawee," but
there is no rule requiring that payment of a check by a drawee
bank shall be confirmed by a simultaneous written acceptance, be-
cause payment amounts to more than an acceptance and has all
the efficacy of an acceptance.

[16] ID.—CHECKS—FORGERY—COLLECTION THROUGH CLEARING-HOUSE—
NEGLIGENCE OF DRAWEE BANK.—In an action by a drawee bank to
recover the amount of certain forged checks paid by defendant as

---

13.   See 25 **Cal. Jur.** 418.

a collecting bank, where the defendant bank received the checks by mail, indorsed them with its clearing-house stamp for purposes of collection only, sent them through the clearing-house and did not pay them to the payee until they were honored by the drawee bank, the collecting bank having paid the checks only after they had been honored by the drawee bank cannot be held liable to reimburse the latter for its loss in having paid its customers' money on the purported drawers' signatures which subsequently were shown to have been forgeries.

---

(1) 7 C. J., p. 624, n. 61, p. 683, n. 82, p. 688, n. 5.   (2) 7 C. J., p. 695, n. 29.   (3) 7 C. J., p. 624, n. 61, p. 625, n. 63.   (4) 7 C. J., p. 624, n. 61, p. 691, n. 9.   (5) 8 C. J., p. 393, n. 9, 10, 11, p. 395, n. 24.   (6) 7 C. J., p. 897, n. 88.   (7) 7 C. J., p. 897, n. 88.   (8) 7 C. J., p. 896, n. 80.   (9) 7 C. J., p. 898, n. 93 New.   (10) 7 C. J., p. 897, n. 87.   (11) 7 C. J., p. 898, n. 93 New.   (12) 8 C. J., p. 365, n. 68 New; 17 C. J., p. 455, n. 64, p. 467, n. 58, 59, p. 523, n. 63.   (13) 17 C. J., p. 452, n. 48, p. 458, n. 96, p. 459, n. 97.   (14) 7 C. J., p. 624, n. 61.   (15) 8 C. J., p. 297, n. 79, p. 303, n. 90.   (16) 7 C. J., p. 625, n. 63.

APPEAL from a judgment of the Superior Court of San Diego County. S. M. Marsh, Judge. Reversed.

The facts are stated in the opinion of the court.

Wright & McKee for Appellant.

Ray M. Harris for Respondent.

CRAIG, J.—The principal question presented for decision upon this appeal is whether or not, under the facts of the case, a collecting bank is legally liable to a drawee bank for moneys paid upon forged checks by the former, which had no means of determining the payor's signature, after their submission to, and honor by, the latter, through the clearing-house, in the regular course of business.

On September 13, 1920, the respondent bank was carrying the account of Thing Brothers, a firm consisting of J. L. Thing and C. E. Thing, who maintained a commercial house at Potrero, in the county of San Diego. On that date appellant received by mail a letter signed "E. E. Snyder," postmarked at Tecate, B. C., Mexico, inclosing two checks drawn on The Security Commercial & Savings Bank of San Diego, respondent herein, for a total of $2,002, and

signed "Thing Bros. by J. L. Thing." The writer requested that appellant collect the amount, and send him by the conductor of a passenger train the sum of $1,700 in cash, to pay his help, and that with the remaining $302 it open a checking account in his name, send him a receipt, some blank checks, and accept "this letter signature as my regular signature to be used in checks." He also requested that remittance be made not later than the following Wednesday, as his men were waiting for the money. On the same day appellant opened an account in the name of E. E. Snyder, for $2,002, and placed upon the checks its clearing-house stamp, which was similar to that used for such purposes by all San Diego banks, and reading: "Paid. San Diego, Cal. Clearing House. Sept. 14, 1920. Southern Trust and Commerce Bank, No. 3." There is an abundance of evidence in the record tending to show that the clearing-house stamp used by appellant was of a regulation form, in wording and character, and that under the rules of the clearing-house all checks passing through it from one bank to another for collection must be indorsed therewith. On the same day the checks were sent through the clearing-house for collection, and were honored by respondent. Appellant wrote its depositor, inclosing signature cards for execution, and advising him that the bank's vaults would not open until 8 o'clock in the morning; that to send the funds by a conductor would necessitate leaving the money at the depot overnight, and that they would therefore forward the money "in the usual way, which is by registered mail and insured, and that he should call at the postoffice at Tecate and receipt for the package. Appellant forwarded no money, however, until the checks had been honored and credit transferred to it by the respondent. It then sent to its correspondent a package containing $1,700, which was addressed to E. E. Snyder, Tecate, California, where mail was delivered on the American side of the international line; the package was registered and insured, and a receipt demanded. In due course of mail appellant received the usual card required by the government as a receipt in such cases, signed, "E. E. Snyder, By P. S. Zarate (Signature of Addressee's Agent." On September 16, 1920, at the request of its depositor, appellant forwarded $300 more in the same manner, for which a like receipt was received, signed,

"E. E. Snyder, by F. Appel." No further deposits were made by Snyder with the appellant bank.

On or about November 19, 1920, more than two months thereafter, Thing Brothers discovered that $2,002 had been charged to their account for which they had not issued checks; the Snyder checks were found among their returned vouchers, and respondent was immediately notified that they were forgeries. Representatives of the respondent bank thereupon demanded reimbursement from appellant. Zarate, *alias* Snyder, was arrested and convicted of the crime (*People* v. *Zarate*, 54 Cal. App. 372 [201 Pac. 955]), and the instant suit was commenced for $1,402, respondent having collected about $500 from the forger. The case was tried before the superior court, without a jury, and judgment was rendered in favor of the plaintiff, from which the defendant appeals.

The substance of this action is embodied in certain statements contained in the findings of the trial court, which, if legally tenable, would require an affirmance. The lower court found that "the plaintiff, relying upon the fact that said checks *had each been cashed* in the regular course of business by defendant, and that the defendant had taken due precautions *to identify the person cashing same, and to determine the genuineness of his signature,* paid same to defendant." And it is then recited that by the acts of appellant it represented to respondent that it knew the payee, that the indorsement was his genuine signature, and that appellant had identified him and knew him to be E. E. Snyder; that as a matter of fact, appellant did not determine the genuineness of said signature, and did not identify the payee; that he did not appear before any officer or agent of appellant bank, and was not known to it.

A careful, thorough, and painstaking study of the evidence and of the cases cited by the respective parties impels us to conclude that the findings in question are not supported by the evidence nor by the weight of authority. The defendant has two distinct lines of defense, either of which holding true must result in the denial of respondent's claims. If the finding that appellant's conduct constituted negligence is unsupported by the evidence, clearly no recovery can be had. Again, even though the appellant may have been negligent in the respect found, the respondent

bank is still left without a cause of action if it, also, was negligent, unless it appears that respondent was misled by the appellant's negligence and induced to omit that degree of scrutiny which it would otherwise have used to detect forgery of the depositor's signature.

Counsel in their briefs have apparently agreed that their respective rights depend upon the comparative negligence of the banks. At any rate, respondent so contends, and bases its claims for recovery upon the proposition that, although it was negligent, it was misled and its carelessness was caused by the preceding and inducing negligence of the appellant. Numerous opinions are cited and excerpts therefrom quoted in which the right of a drawee bank to recover money paid to another bank on the forged signature to a check of one of the former's depositors has been upheld. We have examined these cases, and many others, and find that with few exceptions each possesses some element making it distinguishable from the one before us. These decisions will be discussed later.

Some conflict exists in the decisions as to certain phases of the law, upon matters which, unless close scrutiny be applied, may be confused with the issues involved in the instant case. Therefore, it will be well at the outset to state certain legal principles applicable here which are firmly established and cannot be the subject of doubt.

[1] A drawee bank of a negotiable instrument is chargeable, among other things, with knowledge of the signature of the drawer. If the drawee pays upon a forged signature of the drawer he cannot recover against an innocent payee, if such recovery would result in loss to the payee. (*Price v. Neal,* 3 Burr. 1354, 97 Eng. Reprint, 971; *Crocker-Woolworth Bank* v. *Nevada Bank,* 139 Cal. 564 [96 Am. St. Rep. 169, 63 L. R. A. 245, 73 Pac. 466] ; *Bank of United States* v. *Bank of Georgia,* 10 Wheat. 349 [6 L. Ed. 339] ; *Johnston* v. *Commercial Bank,* 27 W. Va. 343 [55 Am. Rep. 315] ; *Stout* v. *Benoist,* 39 Mo. 277 [90 Am. Dec. 466] ; *National Bank of Rolla* v. *First Nat. Bank of Salem,* 141 Mo. App. 719 [125 S. W. 513] ; *First Nat. Bank of Cottage Grove* v. *Bank of Cottage Grove,* 59 Or. 388 [117 Pac. 293] ; *First Nat. Bank* v. *United States Nat. Bank,* 100 Or. 264 [14 A. L. R. 479, 197 Pac. 547] ; *Dedham Nat. Bank* v. *Everett Nat. Bank,* 177 Mass. 392 [83 Am. St. Rep. 286, 59 N. E. 62] ;

*Farmers' Nat. Bank* v. *Farm Trade Bank,* 159 Ky. 141 [L. R. A. 1915A, 77, 166 S. W. 986].)

[2] Where a bank, without inquiry or identification of the person presenting a forged check, purchases it, indorses it generally, and presents it to the drawee bank, which pays it, the latter may recover in the event that its only negligence is its mistake in having failed to detect the forgery, for, in this instance, its mistake did not mislead the purchaser of the instrument or bring about any change in its position. (*Crocker-Woolworth Bank* v. *Nevada Bank, supra; Canadian Bank* v. *Bingham,* 30 Wash. 484 [60 L. R. A. 995, 71 Pac. 43]; *First Nat. Bank of Danvers* v. *Bank of Salem,* 151 Mass. 280 [21 Am. St. Rep. 450, 24 N. E. 44]; *First Nat. Bank of Crawfordsville* v. *Indiana Nat. Bank of Lafayette,* 4 Ind. App. 355 [51 Am. St. Rep. 221, 30 N. E. 808]; *First Nat. Bank of Pukwana* v. *Brule Nat. Bank of Chamberlin,* 38 S. D. 396 [12 A. L. R. 1079, 161 N. W. 616]; *People's Bank of Springfield* v. *Franklin Bank of Clarksville,* 88 Tenn. 299 [17 Am. St. Rep. 884, 6 L. R. A. 724, 12 S. W. 716].) [3] But the rule is otherwise if the check was received by the bank for collection only, and upon presentation to the drawee bank is paid by it. If the drawee bank has honored the check it cannot recover from the collecting bank which, in reliance upon the act of the drawee, has disbursed the amount required by the payee. (*Bank of Williamson* v. *McDowell County Bank,* 66 W. Va. 545 [36 L. R. A. (N. S.) 605, 66 S. E. 761]; *Bank of United States* v. *Bank of Georgia, supra; Gloucester Bank* v. *Salem Bank,* 17 Mass. 33; *Bank of St. Albans* v. *Farmers' & M. Bank,* 10 Vt. 141 [33 Am. Dec. 188]; *National Park Bank* v. *Ninth Nat. Bank,* 46 N. Y. 77 [7 Am. Rep. 310]; Morse on Banks and Banking, sec. 466.)

[4] Of course, if the collecting bank is alone culpable, and on account of its negligence only the loss has occurred, the drawee may recover. But where the drawee is alone at fault it must stand the loss. And, also, where the drawee and the collecting banks are equally at fault, the burden will be left where it is found, and the drawee bank cannot recover. (*Bank of Williamson* v. *McDowell County Bank, supra; Commercial & Sav. Bank* v. *Citizens' Bank,* 68 Ind. App. 417 [120 N. E. 670]; *San Francisco Nat. Bank*

v. *American Nat. Bank of Los Angeles*, 5 Cal. App. 408 [90 Pac. 558] ; *First Nat. Bank* v. *United States Nat. Bank*, 100 Or. 264 [14 A. L. R. 479, 197 Pac. 547] ; *Dedham Nat. Bank* v. *Everett Nat. Bank*, 177 Mass. 392 [83 Am. St. Rep. 286, 59 N. E. 62].)

With the correctness of these principles we apprehend there can be no contest. The difficulty, if any, may arise in making application to them to the facts found, or which should have been found, from the evidence. Before attempting to do this, certain other principles must be taken into account, for they intervene between those above stated and the circumstances making up the transaction which is the subject of this litigation.

[5] Two of the classes of indorsements enumerated in our Civil Code are general and restrictive. By a general indorsement the indorser warrants, among other things, to every subsequent holder, not liable to him, that the paper is in all respects what it purports to be, that he has good title to it, and that the signatures of all prior parties are binding upon them. An indorsement is restrictive which constitutes the indorsee an agent of the indorser. (Civ. Code, sec. 3117.)

[6] Banks may associate themselves together and make rules for their own government, which, as between the members of their association, will supplement, and even supplant the law. (*Crocker-Woolworth Bank* v. *Nevada Bank, supra; Davis* v. *Nat. Bank*, 118 Cal. 600 [50 Pac. 666] ; *Luckehe* v. *First Nat. Bank*, 193 Cal. 184 [223 Pac. 547].)

At first it will be well to eliminate from consideration any irrelevant matter contained in the facts as we have stated them. Both sides have given considerable attention to the conduct of the appellant bank in delivering the money through registered mail. This entire incident is beside the subject. Excepting only that appellant allowed the conditional credit to Snyder to become unconditional, and paid him the money as it did, whatever else was done subsequently to the payment of the checks by the respondent has no bearing upon the rights of the parties. No degree of negligence on the part of appellant after this act of respondent could have influenced the latter in the least or constituted any inducement to its lack of care in honor-

ing the checks without making the usual effort to detect the possible forgery of Thing Brothers' signatures. It is upon the theory that some act or omission of appellant served as such an inducement, and upon that theory only, that the respondent can hope to recover. The question of appellant's want of care after the checks were honored by respondent is necessarily a false quantity.

Likewise it is unimportant to determine or consider whether E. E. Snyder is a real or fictitious person. It is conceded that Zarate indorsed the name "E. E. Snyder" on the checks, that Zarate was the person, and the only one, actually involved in the fraud. He forged the name of Thing Brothers to the checks; he wrote the indorsement "E. E. Snyder" on the back of each of them; and he received the money in question. For the purposes of this opinion, therefore, Zarate and Snyder are one and the same person and he will be referred to herein as Snyder.

The essential facts, then, may be thus stated: Thing Brothers were customers of and maintained a checking account with the respondent bank; the signature of this firm was forged to two checks, drawn on respondent, purporting to be in favor of E. E. Snyder; the name of "E. E. Snyder" was written upon the backs of the checks by Zarate; they were sent by mail to the appellant bank, inclosed with a letter signed "E. E. Snyder," asking that they be collected, that a part of the money be sent to E. E. Snyder, and that the balance be deposited in that name, and that the signature to the letter be retained as the regular signature of Snyder, to be used upon checks. On the same day on which this letter and the checks were received, appellant opened an account in the name of "E. E. Snyder" in the amount of the checks and sent them through the clearing-house with its clearing-house stamp imprinted on the backs thereof; they were honored by respondent, and after being so honored and paid by respondent, appellant forwarded the money requested by Snyder, and two days later received and cashed a check upon the account of E. E. Snyder for $300 additional.

It is clear that unless there is some element contained within these facts to remove this case from the province of a general principle previously stated, respondent cannot recover. That principle provides that where a drawee has

honored and paid a forged check presented to it by another bank for collection, the drawee bank cannot require repayment from the collecting bank, if this would result in loss to the latter. Respondent maintains that there are circumstances here present which withdrew this case from the application to that rule. First, it is said that, regardless of the fact that appellant did not irrevocably credit Snyder with the checks signed "Thing Brothers," or forward the money in part payment of them until after learning that the respondent had honored the same, still, that the wording of appellant's clearing-house stamp amounted to a representation that appellant had purchased the checks and that it knew the payee, had identified him, and that the indorsements upon them were his genuine signatures. It should be borne in mind that the other facts stated in the findings which legally justify recovery by the respondent are predicated on the proposition that the appellant's stamp indorsement constituted a representation that it had purchased the checks and had become the owner of them, and was not merely an agent for their collection. This the court found to be the fact. All of the other material findings either grow out of or derive their materiality from this pivotal proposition, that the Southern Trust & Commerce Bank cashed the checks before sending them through the clearing-house, and indorsed them generally. The court found that by said acts appellant represented that it knew the payee of said checks and that the signatures on the backs thereof were his genuine sugnatures, and that it had identified the party presenting said checks for payment, and knew that he was the payee thereof. Again, it found the existence of a well-established custom among the banks of San Diego that no check shall be "paid" to a stranger, but that in presenting a check for "payment" he shall be properly identified before any money is "paid" to him thereon. Obviously, these findings would become immaterial if it were the fact that the appellant, instead of paying the amount of the checks to a stranger, merely took them for collection and so indicated by its indorsement. Again, the entire finding, beginning with the proposition that appellant "had special reason to have acted with caution in the cashing" of said checks and indorsing the same with its clearing-house stamp, etc., springs from the idea and the

fact previously found and unquestionably central in and essential to the respondent's cause of action, that appellant did *cash* these checks before sending them through the clearing-house to the respondent for payment by it. [7] Hence, the interpretation to be given the placing by appellant of its clearing-house stamp indorsement upon each of the checks is vital to the rights of the parties. It is hardly open to dispute that these banks are bound by any interpretation which they have agreed upon between themselves and with other members of the clearing-house association.

It is quite possible that a person ignorant of banking usages and rules might have been misled by the use of the word "paid" in appellant's clearing-house stamp; but it is unthinkable that a bank or anyone at all conversant with the customary methods in which bank clearing-houses function would believe for a moment that any regulation clearing-house stamp represents to another bank member of the clearing-house association that the checks or other negotiable instruments upon which it is placed have been purchased by the bank whose stamp appears thereon. [8] It is common knowledge that a clearing-house is what its name indicates; it is an association composed of a number of banks for convenient and expeditious handling of certain claims and credits against and in favor of members. Instead of the collecting bank placing its formal general indorsement upon the back of a check and sending an employee to the drawee to receive the money, the check is stamped with the regular clearing-house stamp, the form and legal effect of which have been agreed upon by all of the members, and is transmitted, with dozens of other similar instruments, to the clearing-house. [9] The stamp is for clearing-house purposes only. It is not a general indorsement. The word "paid" does not import or indicate to any drawee member that the holder member has purchased the paper. We repeat, this word "paid," as well as the entire stamp, for that matter, is used for clearing-house purposes only. The stamp is a receipt, a conditional one, to become absolute when the check is honored by the drawee. It amounts to an acknowledgment that the drawee has paid the check. These facts are matters of common knowledge, known to business men generally. Some of them are recognized in the decisions, such as the case of *Crocker-Wool-*

*worth Bank* v. *Nevada Bank, supra.* Some are stipulated in the rules of the San Diego clearing-house association, and the testimony of witnesses established the usages of members of the association as to a part.

Among the findings is one to the effect that section 2 of rule VII of the clearing-house association provides: "All negotiable paper deposited for clearance by members of this Association shall bear the stamp of the depositing bank, which shall clearly indicate the name of the bank, its clearing house number and the date of clearance. The stamp *shall be for clearing house purposes only* and shall guarantee the validity and regularity of all prior endorsements on the paper so cleared except the endorsement of an original payee of a certificate of deposit, and shall not be construed to supply a missing endorsement."

In *Crocker-Woolworth Bank* v. *Nevada Bank, supra,* a clearing-house rule which was identical in its language with the above was considered and construed, and it was held that the use of the clearing-house stamp pursuant to its regulation resulted in a special and restrictive indorsement for clearing-house purposes only, "and conveyed no representation whatsoever to the plaintiff that the defendant claimed or asserted itself to be the owner of the check"; and further that this rule "eliminates, among other things, from the warranty of the indorsement the code provisions that the instrument is in all respects what it purports to be." The wording of that stamp was precisely the same as here, but regardless of its wording, the rules fixing its meaning as between members of the association are also the same, and must govern. The language contained within the stamp is immaterial; it might be so worded as to be entirely meaningless when considered according to its ordinary acceptation; it might be in code form, but in any case, the rule of the association would govern as to its interpretation. Even if the stamp stated in so many words, "this check has been purchased by this bank and its genuineness is guaranteed," it could not be held to mean what that language ordinarily imports in the face of a rule agreed upon by members stipulating that this particular stamp made up of these exact words shall, as among member banks and when so used, have a different meaning and be for clearing pur-

poses only, and shall constitute only a restrictive indorsement. Under clearing-house rules of like language and import it was held in the case last cited that the use of the clearing-house stamp indorsement conveyed no representation nor warranty to the drawee that the drawer's signature was genuine.

[10] Outside and independent of this rule, the usage and custom of banks taking paper drawn on other banks and passing it through the clearing-house is well established, and must be regarded as having been known and recognized by the respondent. This custom and its recognition was clearly stated in the opinion of our supreme court in *Crocker-Woolworth Bank* v. *Nevada Bank, supra,* in which it is said: "Common knowledge and common experience inform us that in the case of local checks such as this, it is the uniform, if not the well-nigh universal, practice for banks to take them from their depositors and clients for collection only. They do not 'buy' them. They take them as agents. And if this common knowledge needed reenforcement, it is abundantly furnished by the evidence of the officers of the banks testifying in this case, to the effect that if it was not the uniform practice never to buy local checks, it was certainly the general practice to take them only for purposes of collection. . . . It will not be assumed against the uniform practice of banks in this regard, and in the absence of any evidence at all upon the subject, that the plaintiff here, and in this sole and particular instance, put reliance upon the supposed ownership of the check by defendant. If indeed it did have such belief, then the complete answer is, that the restricted endorsement did not justify nor warrant it in that belief, nor make the defendant liable because such belief was entertained."

The above reasoning and pronouncement exactly fits the situation before us. It may logically be added that if the drawee bank did actually believe the collecting bank had purchased the checks, although such a belief was prohibited by usage, rule, and law, in view of the fact that it was so prohibited it was the drawee's duty before placing any reliance upon such a belief to have made inquiry and ascertained whether or not that belief was in accordance with the facts.

We must therefore conclude that when construed by the rule of the association above quoted, the meaning and authority of which has been passed upon by our supreme court, and in the light of usage, the use of the clearing-house stamp was a mere formality, placed there in compliance with the provision of the rule requiring it upon all negotiable paper deposited for clearing. It constituted a restrictive indorsement only, and as such it involved no representation that appellant was the owner of these checks.

[11] It obviously follows that the finding of the lower court that "the plaintiff, relying upon the fact that said checks had each been *cashed* in the regular course of business by defendant and that the defendant had taken due precautions to identify the person *cashing* them, and to determine the genuineness of his signature, paid same to defendant," is entirely unsupported by the evidence. And it is equally clear that the further finding to the effect that by the acts of the appellant it represented to respondent that it knew the payee, that the indorsement was his genuine signature, and that appellant had identified him and knew him to be "E. E. Snyder," is unsupported by the evidence, since the only act which could possibly be construed as constituting such representation is the use by appellant of its clearing-house stamp on the checks.

[12] Now, let us consider the significance of the fact that checks were received by appellant through the mail, and that information to this effect was not communicated to respondent. At the outset we .are confronted with the proposition that since the indorsement was of a restrictive character it conveyed no information to the drawee concerning the original payee, nor did it purport to do so. (*Commercial & Sav. Bank Co.* v. *Citizens' Nat. Bank of Franklin*, 68 Ind. App. 417 [120 N. E. 670], and cases there cited.) Consequently, the drawee could not have been misled into believing that the payee had been .identified by appellant. We might end the discussion of this point here, but if we turn to the testimony of the several witnesses who were interrogated as to the usage of banks in San Diego with respect to deposits received by mail, the result is an utter failure to show any special custom concerning the manner in which checks so received are transmitted through the clearing-house to banks on which they are drawn. In

the entire absence of any evidence of the existence of such usage it cannot be said that the finding of the trial court that there was such a usage and that a failure on the part of appellant to comply with it was negligence has any support. The nearest approach to testimony which might justify such an inference is that of the witness Mueller, assistant cashier of the San Diego Savings Bank. In response to a hypothetical question, this witness testified on direct examination that in a case where the circumstances of the transaction were such as here involved the general custom among San Diego banks would "require the taking of the matter up" with the drawee bank. This answer is decidedly uncertain, but assuming that the witness intended to convey the idea that the general custom was to inform the drawee under such circumstances that checks were received by mail, the force of the answer was destroyed by the witness' admission under cross-examination that he could not say whether or not this usage had been acceded to by each member of the clearing-house association, nor was the witness able to mention a single instance where such a practice had been followed in a similar transaction, or a single bank, aside from the San Diego Savings Bank, which had ever recognized it as a custom. It is true that another witness, Alexander Reynolds, vice-president of the United States National Bank, called as a witness for the plaintiff, in answer to the same general hypothetical question, on direct examination, testified that the general custom would be to notify the drawee bank of the circumstances under which the checks were received. But he also on cross-examination even more clearly than the witness Mueller qualified the foregoing assertion by saying that there was no uniform custom among the banks as to the method of handling checks sent for collection through the mails, and again, "some banks fail to follow the custom I have just testified to; those who fail to follow don't adopt it." It is elementary that to measure up to the legal definition of a custom or usage which is binding upon all persons of a class it must have been universal, uniform, and undisputed. (*Duvall* v. *Farmers' Bank*, 9 Gill & J. (Md.) 31; *Greenfield Bank* v. *Crafts*, 2 Allen (Mass.), 269.) **[13]** A custom or usage which will enter into and affect the rights and liabilities of persons in their dealings with each other must

be certain, uniform, and either known to those sought to be charged thereby or so generally known and notorious that knowledge and adoption thereof must be presumed. (*Russell's Ex.* v. *Ferguson,* 77 Vt. 433 [60 Atl. 802]; *Baltimore B. B. & Ex. Co.* v. *Pickett,* 78 Md. 375 [44 Am. St. Rep. 304, 22 L. R. A. 690, 28 Atl. 279]; *Citizens' Bank of Baltimore* v. *Graffin,* 31 Md. 507 [1 Am. Rep. 66]; *Harper* v. *Pound,* 10 Ind. 32; *Smith* v. *Gibbs,* 44 N. H. 335; *Chicago, M. & St. P. R. Co.* v. *Lindeman,* 143 Fed. 946, 949 [75 C. C. A. 18].) In the case last cited it was held that where a plaintiff's witnesses testified that there was a custom of doing certain railroad work in a certain way, and defendant's witnesses testified that they did the same work at the same time in a different way, a finding of a uniform custom was not authorized.

The record contains positive testimony of other witnesses to the effect that there was no general custom among members of the clearing-house association as to notifying a drawee bank when checks were received by mail. From the testimony of various witnesses it cannot be doubted that it is no unusual thing for banks in San Diego to receive checks for collection by mail, and the court so found; but the evidence does not support the finding that such checks are treated differently from any others in any way, and particularly in the matter of sending them through the clearing-house, or giving special notice to the drawee bank of the fact that they came to the collecting bank by mail.

We must, then, eliminate as unsupported by the evidence the trial court's finding that "it is not customary among the banks in said city to indorse the same with the clearing-house stamp of the receiving bank and to send said checks so received and so indorsed through the clearing-house for collection on a drawee bank." This finding referred to checks received for collection by mail. Also, as we have shown, the finding that "the plaintiff relying upon the fact that said checks had been cashed in the regular course of business by defendant, and that the defendant had taken due precautions to identify the person cashing same, and to determine the genuineness of his signature, paid same to defendant," has no support or justification in the evidence. The finding last quoted is based upon, and falls with the elimination of, the finding that appellant cashed

the checks before sending them through the clearing-house, since the checks were not cashed before being sent through the clearing-house and before being paid by the drawee, and the stamp was no representation that they had been cashed. In other words, as they were not purchased, but only received and passed on under a delegation of authority from the payee for collection, it also necessarily follows that the further finding that there existed a well-established custom among San Diego banks that no checks shall be "paid" to a stranger without proper identification is immaterial. It may also be noted that the testimony of the various bank witnesses produced by respondent upon this point each alluded to the payment and purchase of checks, and not to their receipt, as these were, for purposes of agency only and for collection. The existence of a custom that banks will not purchase checks from strangers without identifying the payee is utterly worthless in bolstering up the claim that the same identification is customary or required of a bank which merely accepts employment as an agent to collect a check for a stranger. In this connection it is significant that the cashier of respondent bank testified: "There is a difference between the payment of a check to a payee and the presentation of a check for collection through the clearing-house. If there are no suspicious circumstances connected with the checks or the receipt of them by our bank, we would send the checks through the clearing-house for collection against another bank in the city without first identifying the person presenting them. If a check came to the plaintiff bank through the mail drawn on another bank on an unknown account we would send it through the clearing-house for collection, if there were no suspicious circumstances." This being true, the fact that the defendant sent these checks through the clearing-house with its regular clearing-house stamp, including the word "paid" on the backs thereof, and the fact that no mention was made to the clearing-house or the drawee that the checks had been received by mail, must be removed from consideration; and we have left merely a case of a bank receiving checks for collection, sending them through the clearing-house in the ordinary manner, the drawee bank honoring and paying them without detecting or using the means within its hands to detect the fact that

they were forgeries, and now asking the collecting bank to reimburse it, notwithstanding that the collecting·bank would suffer the loss because of having paid the money out, relying upon the drawee's payment of the same. Such a case is clearly covered by the principles which were stated in the early part of this opinion. They are amply sustained by the authorities there cited, and preclude recovery by the drawee bank.

As we have heretofore indicated, the decisions cited by respondent do not conflict with this conclusion. Many of them agree with and conform to it, and this follows as a logical consequence of the fact that the keystone of respondent's argument as set forth in its briefs consists of the proposition that the appellant's acts and conduct were such as to justify respondent in believing that the appellant had purchased the checks, and owned them, rather than being merely an agent for their collection. In summing up its position counsel for respondent begin by saying that the universally accepted rule is that the negligence of the bank "cashing" a check overcomes the constructive negligence of the drawee bank in failing to detect a forged signature of its depositor. And under the heading, "It makes a difference whether the check is indorsed 'paid,' or 'for collection,'" respondent cites the following cases: *First Nat. Bank of Belmont* v. *First Nat. Bank of Barnesville,* 58 Ohio St. 207 [65 Am. St. Rep. 748, 41 L. R. A. 584, 50 N. E. 723] ; *First Nat. Bank of Pukwana* v. *Brule Nat. Bank of Chamberlin,* 38 S. D. 396 [12 A. L. R. 1079, 161 N. W. 616] ; *Ellis* v. *Ohio Life Ins. & T. Co.,* 4 Ohio St. 628 [64 Am. Dec. 610]. To this list may be added *Commercial & Sav. Bank Co.* v. *Citizens' Nat. Bank of Franklin,* 68 Ind. App. 417 [120 N. E. 670]. These authorities fully sustain the point for which they are cited, but since the indorsements are to be construed as "for collection," and not "paid," these same decisions result in the point-blank holding against the respondent's right of recovery. In distinguishing authorities cited by respondent from the instant case, or of showing their confirmation of the principles announced, many of them may be grouped into well-defined classes. First, we find those where the bank presenting checks for payment had cashed and purchased them, and which are consequently not in

point, in which class are the following: *Canadian Bank* v. *Bingham*, 30 Wash. 484 [60 L. R. A. 955, 71 Pac. 43]; *First Nat. Bank of Danvers* v. *Bank of Salem*, 151 Mass. 280 [21 Am. St. Rep. 450, 24 N. E. 44]; *First Nat. Bank of Crawfordsville* v. *Indiana Nat. Bank of Lafayette*, 4 Ind. App. 355 [51 Am. St. Rep. 221, 30 N. E. 808]; *First Nat. Bank of Pukwana* v. *Brule Nat. Bank of Chamberlin*, 38 S. D. 396 [12 A. L. R. 1079, 161 N. W. 616]; *People's Bank of Springfield* v. *Franklin Bank of Clarksville*, 88 Tenn. 299 [17 Am. St. Rep. 881, 6 L. R. A. 724, 12 S. W. 716]; *Redington* v. *Woods*, 45 Cal. 406 [13 Am. Rep. 190]; *Citizens' Nat. Bank of Evansville* v. *Reynolds*, 72 Ind. App. 611 [126 N. E. 234]; *Ellis* v. *Ohio Life Ins. & T. Co.*, 4 Ohio St. 628 [64 Am. Dec. 610]; *Farmers' Nat. Bank* v. *Farm Trade Bank*, 159 Ky. 141 [L. R. A. 1915A, 77, 166 S. W. 986]; *Newberry Sav. Bank* v. *Bank of Columbia*, 91 S. C. 294 [38 L. R. A. (N. S.) 1200, 74 S. E. 615]; *Third Nat. Bank* v. *Allen*, 59 Mo. 311; *Williamsburg Trust Co.* v. *Tum Suden*, 120 App. Div. 513 [105 N. Y. Supp. 335]; *Woods* v. *Colony Bank*, 114 Ga. 683 [56 L. R. A. 929, 40 S. E. 720]; and *Bank of Italy* v. *First Bank of Kern*, 69 Cal. App. 319 [231 Pac. 44]. It may be added that in none of these cases was the indorsement restrictive. Several reasons are given for distinguishing this type of cases from those where one bank has taken for collection only checks drawn on another, where, as here, the issue is one of comparative negligence, the reason most clearly indicated as applicable is that, if a bank receives a check from a stranger, cashes and purchases it, and becomes its owner, and thereafter passes it on to the bank on which it is drawn and receives payment from the latter, and it later develops that the check was forged, the holder bank cannot defend in an action brought by the drawee to recover, upon the ground that any act of the drawee misled the other and induced it to part with the money. But, if the first bank, instead of purchasing the checks, had merely taken them for collection and refused to pay out money until confirmation of the genuineness of the signature of the drawer by the drawee, and then, after receiving such confirmation, had disbursed the money received from the drawee to an impostor, the drawee would be in no position

to recover, because its negligence deceived and misled the collecting bank.

In these cases cited by respondent the issues were such, and the several opinions were so worded, as to uphold appellant's, rather than the respondent's, contention, concerning the right of recovery of a drawee bank which has paid out moneys on a forged signature of a depositor: *First Nat. Bank of Portland* v. *United States Nat. Bank of Portland*, 100 Or. 264 [14 A. L. R. 479, 197 Pac. 547]; *Bank of Williamson* v. *McDowell County Bank*, 66 W. Va. 545 [36 L. R. A. (N. S.) 605, 66 S. E. 761]; *Dedham Nat. Bank* v. *Everett Nat. Bank*, 177 Mass. 392 [83 Am. St. Rep. 286, 59 N. E. 62]; *Trust Company of America* v. *Hamilton Bank*, 127 App. Div. 515 [112 N. Y. Supp. 84].

[14] The Civil Code (sec. 3266, subd. g) defines a "holder" as the "payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof." Many of the cases cited by respondent and quoted as upholding the right of a drawee to recover money paid by mistake on a check where the drawer's signature has been forged, use language to the general effect that a drawee may recover against a "holder." Of course, this cannot apply to cases like that before us, where recovery is sought against, not a holder, but a bank which has received the check for collection only. One example of a case so cited is *Farmers' Nat. Bank* v. *Farm & Trade Bank*, 159 Ky. 141 [L. R. A. 1915A, 77, 166 S. W. 986]. One having the mere physical possession of a check for collection is not such "holder" as contemplated by the code definition, or the cited cases. The "holder," under circumstances such as there presented, is the principal, who is entitled to the beneficial interest of the check, rather than his incidental agent for collection only. (*Aurora State Bank* v. *Hayes-Eames Elevator Co.*, 88 Neb. 187 [129 N. W. 279]; *Rice* v. *Hogan*, 38 Ky. [8 Dana] 135; *Nat. Bank of Commerce of Lincoln* v. *Farmers' & Merch. Bank*, 87 Neb. 841 [128 N. W. 522]; *National Exch. Bank of Tiffin* v. *Wiley*, 195 U. S. 257 [49 L. Ed. 184, 25 Sup. Ct. Rep. 70, see, also, Rose's U. S. Notes]; *Scotland County Nat. Bank* v. *Hohn*, 146 Mo. App. 699 [125 S. W. 539].)

*McCall* v. *Corning*, 3 La. Ann. 409 [48 Am. Dec. 454], is not in point. There the drawee was allowed to recover

money paid to a holder and payee, and not as against one presenting for collection only. The element especially distinguishing it is contained in the following brief excerpt from the opinion: "It is an important feature in this case that the holders were not induced to take the bill by any act of the plaintiffs and the case is thus relieved from any equity which might be urged, in the case of a forged bill accepted by the drawee, and going after acceptance into the hands of a *bona fide* holder for value."

In the following cases the indorsement was unrestricted, thus differentiating them from the case at bar: *Bank of Williamson* v. *McDowell County Bank*, 66 W. Va. 545 [36 L. R. A. (N. S.) 605, 66 S. E. 761]; *National Bank of North America* v. *Bangs*, 106 Mass. 441 [8 Am. Rep. 349]; *Ford & Co.* v. *People's Bank of Orangeburg*, 74 S. C. 180 [114 Am. St. Rep. 986, 7 Ann. Cas. 744, 10 L. R. A. (N. S.) 63, 54 S. E. 204].

Composing another class of cases where the issue involved was entirely different from that in the instant case, and in which the language involved in the several opinions could not have been intended to be applicable to such a condition as here presented, are the following: *First Nat. Bank of Washington* v. *Whitman*, 84 U. S. 343 [24 L. Ed. 229, see, also, Rose's U. S. Notes]; *Figuers* v. *Fly*, 137 Tenn. 358 [193 S. W. 117]; *National Bank* v. *Northwest Nat. Bank*, 152 Ill. 296 [43 Am. St. Rep. 247, 26 L. R. A. 289, 38 N. E. 739]; *First Nat. Bank of Belmont* v. *First Nat. Bank of Barnesville*, 58 Ohio St. 27 [41 L. R. A. 584, 50 N. E. 723]; *Arkansas ex rel. Penitentiary* v. *Bank of Commerce*, 133 Ark. 498 [L. R. A. 1918F, 538, 202 S. W. 834]; *Snyder* v. *Corn Exch. Nat. Bank*, 221 Pa. St. 599 [128 Am. St. Rep. 780, 70 Atl. 876]. In each of the above the indorsement was forged, but not the signature, hence the entire decision is necessarily inapplicable to a case where the issue arises and the loss results from a forged signature. (*First Nat. Bank* v. *United States Nat. Bank*, 100 Or. 264 [14 A. L. R. 479, 197 Pac. 547].)

Without discussing them, it may be said that the following cases have no bearing on the issues involved in the instant case: *Elyria Sav. & Banking Co.* v. *Walker Bin. Co.*, 92 Ohio St. 406 [Ann. Cas. 1917D, 1058, L. R. A. 1916D, 433, 111 N. E. 147]; *National Gold Bank & Tr. Co.* v. *Mc-*

*Donald,* 51 Cal. 64 [21 Am. Rep. 697]. While having to do with the general subject at issue, the cases next enumerated are clearly not in point, nor are they in conflict with any principle herein said to bear on the issues of this case: *Rambo* v. *First State Bank of Argentine,* 88 Kan. 257 [128 Pac. 182]; *Ryan* v. *Bank of Montreal,* 12 Ont. Rep. 44; *State Bank of Chicago* v. *Mid-City Trust & Sav. Bank,* 295 Ill. 599 [12 A. L. R. 989, 129 N. E. 498]; *Arkansas ex rel. Penitentiary* v. *Bank of Commerce,* 133 Ark. 498 [L. R. A. 1918F, 538, 202 S. W. 834].

In respondent's brief it is stated: "The following cases hold that the drawee can recover from the holder because of his negligence, notwithstanding the fact that the checks were payable to bearer or to cash: *Dedham Nat. Bank* v. *Everett Nat. Bank,* 177 Mass. 392 [83 Am. St. Rep. 286, 59 N. E. 62]." The decision in that case is squarely the other way. It is there held that where forged checks made payable to cash were deposited with the Everett National Bank, and were paid to it through the clearing-house by the Dedham National Bank, the latter being the drawee, and it appearing that the Everett National Bank required no indorsement of the checks, these facts did not render it liable in an action by the Dedham National Bank to recover the amount of the checks. This holding is based upon the proposition that the Dedham National Bank should have known the genuineness of the signature of the maker, and that the Everett National Bank owed no duty to, and in no way deceived, the plaintiff, Dedham National Bank.

Another of respondent's citations is *First Nat. Bank of Belmont* v. *First Nat. Bank of Barnesvillle,* 58 Ohio St. 27 [65 Am. St. Rep. 748, 41 L. R. A. 584, 50 N. E. 723]. The court there holds that an indorsement "for collection" is notice to the drawee that the indorsee is not the owner of the paper, but only the agent of the owner, authorized to receive payment for him; hence, that such an indorsement does not justify the drawee bank in relaxing its vigilance in determining whether or not the signature of the drawer is genuine. The effect of this decision is to squarely uphold the proposition that in the instant case the respondent had no right to relax its care in examining the drawer's signature and ascertaining as to its genuineness. For, as we have shown,

under the clearing-house rules, as well as the custom, and general authority, the clearing-house stamp indicates to member banks that the paper on which it is placed is presented for collection only, just as plainly as though the words "for collection" were written thereon. The same may be said of *Ford & Co.* v. *People's Bank of Orangeburg,* 74 S. C. 180 [114 Am. St. Rep. 986, 7 Ann. Cas. 744, 10 L. R. A. (N. S.) 63, 53 S. E. 204].

*Greenwald* v. *Ford,* 21 S. D. 28 [109 N. W. 516], does sustain the respondent's contention in holding: "When payment is made to the holder of paper who has come into possession of it without any fault on his part, and his situation would be rendered worse if compelled to refund than it was before receiving payment, the money cannot be recovered from him. If, however, he has been negligent in any regard, he cannot retain the money. To justify him in doing so the bank alone must have been negligent. If neither party has been negligent, or both have been, then the bank can recover the money." But it will be noted that this quotation from Cyc. (vol. 5, p. 546), cited with the court's approval, refers to the holder of the paper; and also there is nothing to indicate that a restricted indorsement was contemplated. The indorsement with which the court was there dealing was one by which all prior indorsements were expressly guaranteed, and it was held that this was of such a character as to mislead the drawee bank.

*First Nat. Bank of Orleans* v. *First State Bank of Alma,* 22 Neb. 769 [3 Am. St. Rep. 294, 36 N. W. 289], is strongly relied upon by respondent. That case is easily distinguishable from the one before us, not only because the defendant bank had purchased the check of a stranger before presenting it to the drawee for payment, but also as the litigants did not belong to the same clearing-house, and the first bank indorsed the check generally. There were no clearing-house rules or restrictive indorsements involved.

Another case especially stressed by respondent deserves further mention. It is *First Nat. Bank* v. *United States Nat. Bank,* 100 Or. 264 [14 A. L. R. 479, 197 Pac. 547]. While the language quoted therefrom by respondent is to be found in the opinion, a cursory examination shows that

two facts were considered most vital in that connection. One was that the defendant bank had purchased the forged checks, the first indorsements upon which were forged, and the other, that the drawer's name was forged, but certain indorsements immediately preceding delivery to the collecting bank were genuine. The case expressly recognizes the rule in *Price* v. *Neal* and cites numerous authorities affirming it. It states the further rule that where a bank negligently purchases checks which afterward are found to have been forged, and secures payment of them from the drawee bank, the former must refund. The opinion admits that even under such circumstances there is some conflict, and that four decisions have held to the contrary, going on to say that to the extent that these four cases are to be regarded as authority for relieving a bank from its mistakes in negligently purchasing a check drawn on another bank, they are out of harmony with practically all else that has been written on the subject. The decision repeatedly indicates that what is there said is predicated on the assumed fact that the defendant bank had purchased the checks and had become their holder, and that the forged indorsement was not involved in consideration of the general principles discussed in that portion of the opinion.

The decision itself is decidedly opposed to the respondent's recovery in the instant case. In this Oregon case the drawer's name had been forged to the checks, the forgers had then indorsed on the backs thereof the names of Rose and Shea, which were fictitious names, and had passed them upon a number of merchants, who, in turn, placed their respective indorsements upon the several checks and presented them to the United States National Bank; this bank placed its clearing-house stamp on the backs of the checks and presented them through the clearing-house to the First National Bank, in which the drawer was a depositor, for payment. The latter bank paid all of the checks to the United States National Bank. It was decided under clearing-house rules similar to those existing in San Diego that the indorsement of the checks by the collecting bank with its clearing-house stamp and the presentment of them to the drawee bank was neither a representation nor a warranty to the drawee that the drawer's signature was genuine; further, that these acts of the collecting

bank did not constitute representations as to the genuineness of the drawer's signature, either under the common law, Negotiable Instruments Act, or rules of the clearinghouse association. The decision also announces another principle which we have had occasion to state. Its position is best expressed in its own language:

"The clearing house rule which provides for the guaranty of prior indorsements refers to the signatures of indorsers, and does not include drawers. *Farmers & M. Bank* v. *Bank of Rutherford,* 115 Tenn. 64 [112 Am. St. Rep. 817, 88 S. W. 939]; *National Bank of Rolla* v. *First Nat. Bank of Salem,* 141 Mo. App. 719 [125 S. W. 513]; *State Bank* v. *Cumberland Savings & Trust Co.,* 168 N. C. 605 [L. R. A. 1915D, 1138, 85 S. E. 605]; *Cherokee Nat. Bank* v. *Union Trust Co.,* 33 Okl. 342 [125 Pac. 464].

"In the instant case it must be remembered that the checks were never at any time valid subsisting orders; they were not orders originally valid but subsequently unlawfully changed by the addition of an invalid incident. The checks involved here as well as all their incidents, were invalid from the very beginning. The loss incurred by the plaintiff is traceable to the act which originated the checks. The loss sustained by the plaintiff was caused by its failure to detect the forgery of the drawer's signature. From the moment of their origin the checks were invalid because not bearing the genuine signature of the drawer. If the indorsements of Rose and Shea be treated as forgeries, the plaintiff is nevertheless precluded from recovering for the reason that the plaintiff failed to detect the forgery of Insley's signature. The forged indorsements of Shea and Rose, assuming them to be forgeries, put the plaintiff in no worse position than it would be left if the indorsements were genuine. The First National Bank cannot be called upon to pay again, and the United States National Bank has not received the proceeds of an instrument to which another had a better title."

On the whole, this case is very similar to the one before us, and upon every material element is against the recovery by the drawee bank under the circumstances here presented.

There is much discussion in the briefs of the rule that a drawee is bound to know its depositor's signature, as an-

nounced more than one hundred and sixty years ago in England (*Price* v. *Neal,* 3 Burr. 1354, 97 Eng. Reprint, 871), wherein it was said: "It was incumbent upon the plaintiff, to be satisfied 'that the bill drawn upon him was the drawer's hand,' before he accepted or paid it; but it was not incumbent upon the defendant, to inquire into it. . . . He made no objection to them, at the time of paying them. Whatever neglect there was, was on his side." Respondent insists that such is not the modern rule, that there has been much conflict of authorities, throughout the country, and that in our own state it has been abandoned. We think from careful comparison and study of various authorities, including those cited, that the divergent holdings may generally be accounted for by the fact that each case presented its own peculiar circumstances, and was required to stand upon them. This undoubtedly has led to some confusion, but, as was said by the author in 12 A. L. R. 1089: "The application of the proper rule to a given state of facts is seldom difficult, if the attention is fixed solely on the problem to be solved, but if a rule which is inapplicable is first stated, and then an attempt made to show that it is unsound, conflict and confusion result, which, in most cases, are entirely unnecessary."

Prior to the enactment of our negotiable instruments law, the case of *Crocker-Woolworth Bank* v. *Nevada Bank,* 139 Cal. 564 [96 Am. St. Rep. 169, 63 L. R. A. 245, 73 Pac. 456], was decided, wherein it was said: "Thus, it is the law beyond controversy that the drawee of a negotiable instrument is chargeable with knowledge of the genuineness of the signature of the drawer, of the condition of his funds, and of the state of his credit. If the drawee pays upon the forged signature of the drawer, he cannot recover against an innocent payee, if the recovery would subject such payee to loss. Such has been the rule since *Price* v. *Neal,* 3 Burr. 1354, decided by Lord Mansfield in 1762."

Such was the holding in *Bank of Williamson* v. *McDowell County Bank, supra,* the supreme court of West Virginia there saying: "It was the duty of the drawee to determine at its peril the genuineness of the signature of its depositor, and its sole right to demand reimbursement

from the defendant rests upon technical fault in the latter. . . . Though the forged name and the· genuine signature are very similar, even the slight difference might have been noticed had a comparison been made at the time." A judgment for the defendant was affirmed, and one of the learned justices of that court wrote a concurrring opinion especially emphasizing the fact that the majority opinion is really in line with *Price* v. *Neal,* and should have so stated. Many other authorities cited by both parties to the instant case, decided before and after the advent of the negotiable instruments law, adhere to the same rule. Some of these are *National Bank of Rolla* v. *First Nat. Bank of Salem,* 141 Mo. App. 719 [125 S. W. 513] ; *Dedham Nat. Bank* v. *Everett Nat. Bank,* 177 Mass. 392 [83 Am. St. Rep. 286, 59 N. E. 62] ; *Ellis* v. *Ohio Life Ins. & T. Co.,* 4 Ohio St. 525 [64 Am. Dec. 610] ; *Farmers' & M. Bank* v. *Bank of Rutherford,* 115 Tenn. 64 [112 Am. St. Rep. 817, 88 S. W. 939] ; *Farmers' Nat. Bank* v. *Farm & Trade Bank,* 159 Ky. 141 [L. R. A. 1915A, 77, 166 S. W. 986] ; *Figuers* v. *Fly,* 137 Tenn. 358 [193 S. W. 117] ; *Minnehaha Nat. Bank* v. *Pence,* 42 S. D. 525 [176 N. W: 37] ; 5 R. C. L. 556.

In *Utah Nat. Bank* v. *Smith,* 180 Cal. 1 [179 Pac. 160], it was said by our own supreme court: "It is generally held that it is the duty of the courts in construing this law to have in mind the purpose of securing uniformity in the law of commercial paper. *State Bank etc.* v. *Bilstad,* 162 Iowa, 433 [49 L. R. A. (N. S.) 132, 136 N. W. 204, 144 N. W. 363] ; *Felt* v. *Bush,* 41 Utah, 462 [126 Pac. 688] ; *Union Trust Co.* v. *McGinty,* 212 Mass. 205 [Ann. Cas. 1913C, 525, 98 N. E. 679] ; *Broderick* v. *McGrath,* 81 Misc. Rep. 199 [142 N. Y. Supp. 497] ; *Rockfield* v. *First Nat. Bank,* 77 Ohio St. 311 [14 L. R. A. (N. S.) 842, 83 N. E. 392]. As the view of the supreme court of Utah on this rule of interpretation is of special interest, we quote from the case of *Felt* v. *Bush, supra,* as follows: "The question, therefore, it seems to us has passed beyond the domain of judicial discussion. As we understand it, the negotiable instruments law was intended to give legislative sanction to the majority rule to which reference has been made and was conceived by its authors and adopted by the different state legislatures for the express purpose

of harmonizing the conflicting decisions which had been rendered on the subject of negotiable instruments and the rights of those interested therein whose rights were acquired before maturity. As we view it, therefore, it is our plain duty to follow the numerous decisions that have directly passed upon the negotiable instruments law, and have construed it in accordance with the majority rule.''

It will be seen, therefore, that the majority rule has expressly been adopted in this state, and that since by almost unanimous judicial action in all jurisdictions drawee banks are held liable for payments made upon forged instruments and charged to the accounts of their depositors, that uniformity sought to be secured by enactment of the negotiable instruments law must be said to have continued in force the rule announced in *Crocker-Woolworth Bank* v. *Nevada Bank, supra. Union Tool Co.* v. *Farmers & Merchants' Nat. Bank,* 192 Cal. 40 [28 A. L. R. 1417, 218 Pac. 424], involved the question of direct liability of a drawee bank to its depositor but the same question of diligence in comparing signatures was discussed, and it was said that, ''assuming that the plaintiff was negligent in not making a more thorough examination of the returned checks, although the trial court found he was not negligent, still the depositing bank may not escape liability for the payment of amounts paid on forged checks unless it has itself been free from negligence. Here the finding of the trial court that the bank was negligent is clearly sustained by the evidence.'' And in *Glassell Development Co.* v. *Citizens' Nat. Bank,* 191 Cal. 375 [28 A. L. R. 1427, 216 Pac. 1012], where as in the case last cited, the drawee bank failed to make the comparison, it was held that ''when by the exercise of proper care it could have discovered the alteration or forgery, it must bear the loss notwithstanding that the depositor failed in his duty to examine the accounts.''

In the case at bar, the drawee had in its files for convenient immediate reference the genuine signatures of its depositors; it was testified that the forgeries were unlike the specimen signatures, and dissimilarities were pointed out during the trial, yet respondent's president said that he did not think any comparison was made in this instance.

The uniform negotiable instruments law of this state (Civ. Code, sec. 3143) provides as follows:

"The acceptor by accepting the instrument engages that he will pay it according to the tenor of his acceptance; and admits—

"1. The existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument; and

"2. The existence of the payee and his then capacity to indorse."

[15] Appellant contends that had the plaintiff bank discovered the forgeries, the funds would not have been forwarded, and that no loss would have occurred; but that by payment to appellant and cancellation of the checks respondent accepted them, represented to appellant that they were genuine, and caused the latter to change its position. Respondent, relying upon section 3213 of the Civil Code, that "acceptance must be in writing and signed by the drawee," insists that it did not accept the checks, within the express intendment of said section, and that therefore its cancellation and credit to appellant was subject to repudiation upon discovery of the forgery two months later.

An engagement by one party to perform some act under the negotiable instruments law, such as to honor a bill of exchange when presented in future, or to meet the paper of another, must concededly be in writing, and be signed; such is the plain language of the statute, and it facilitates notice, and other steps that may be found necessary. But we are not aware of any rule requiring that payment of a check by a drawee bank shall be confirmed by a simultaneous written acceptance. This question was decided by the supreme court of Oregon, in *First Nat. Bank of Cottage Grove* v. *Bank of Cottage Grove,* 59 Or. 388 [117 Pac. 293], where it was said: "The payment of a bill or check by the drawee amounts to more than an acceptance. The rule, holding that such a payment has all the efficacy of an acceptance, is founded upon the principle that the greater includes the less. *National Bank* v. *First Nat. Bank,* 141 Mo. App. 719 [125 S. W. 513]; *Neal* v. *Coburn, supra.* . . . Under the provision in section 6021, L. O. L., that, where the holder of a check procures it to be

accepted or certified, the indorsers are discharged from liability, the plaintiff, when it paid the checks in question, precluded itself from setting up that the check was a forgery on any want of authority of the person affixing the signature it purported to bear, within the meaning of section 5856, L. O. L. The following cases, in which the negotiable instruments law is applied, sustain this view: *Bank of Com.* v. *Mech. Nat. Bank,* 148 Mo. App. 1 [127 S. W. 429]; *Title Guarantee & T. Co.* v. *Haven,* 126 App. Div. 802 [111 N. Y. Supp. 305]; *National Bank of Rolla* v. *First Nat. Bank of Salem, supra; Farmers & Merchants' Bank* v. *Rutherford Bank,* 115 Tenn. 64 [112 Am. St. Rep. 817, 8 S. W.. 939].

It is further argued by appellant, and denied by respondent, that the checks in controversy, having been worded "Pay to E. E. Snyder, *or order,*" were in a measure not unlike checks payable "to cash," and so required no indorsement, and that identification of the payee was therefore unnecessary. As we have shown, whether or not Snyder, *alias* Zarate, indorsed his true name upon these instruments, there can be no question that the purported payee and indorser received the money. Respondent admits that the checks were forgeries, and that it honored them as the genuine paper of Thing Brothers. Having done so, it transmitted the funds or credit to the collecting bank, which thereupon sought out and paid the identical person who had opened an account and deposited the checks. Hence, we think the question as to whether or not appellant would have been absolved from liability had it proceeded without indorsement or identification is beside the issue and need not here be decided.

[16] In conclusion, we hold that since it was the custom among members of the San Diego clearing-house association to accept business by mail, the fact that the checks in question were received by the collecting bank in that manner does not constitute a suspicious circumstance; also that the indorsements upon these checks did not constitute a representation that they had been paid, or a guarantee of their genuineness, but were placed thereon only for the purposes of collection. Therefore, the conduct of the appellant was free from any negligence which could possibly have induced the respondent to relax the scrutiny required

of it as a drawee to detect the forgery of its depositor's signature. On the other hand, failure of the respondent bank to make comparison of the signatures upon the checks with their exemplars was a negligent omission. Under these circumstances, the collecting bank having paid the checks only after they had been honored by the drawee bank, cannot be held liable to reimburse the latter for its loss in having paid its customers' money on the purported drawers' signatures which subsequently were shown to have been forgeries.

The judgment is reversed.

Finlayson, P. J., and Works, J., concurred.

A petition by respondent to have the cause heard in the supreme court after judgment in the district court of appeal, was denied by the supreme court on December 24, 1925.

All the Justices present concurred.