## McCall et al. *v.* Corning et al.

The holder of a bill is allowed to profit by an accidental payment, though the drawer's name be forged, when there has been an interval between payment and notice to him of the forgery, and his situation has been altered to his prejudice, either in fact or in legal presumption. The rule that payment by the drawee admits the genuineness of the drawer's signature, and that the former is thereby legally estopped from disputing it, is only true in this qualified sense.

Acceptance of a bill is not an admission of the payee's signature.

The holder of a bill, upon which the payee's endorsement is forged, cannot recover from the acceptor, whose engagement is to pay according to the tenor of the bill, that is, to the payee himself, or his genuine order.

A *bonâ fide* holder of a bill, of which the payee was a fictitious person, ignorant of the fact, may recover against an acceptor who knew that the payee was a fictitious person; but an acceptance, without knowledge by the acceptor of the fictitious character of the payee, is completely void.

Where the holder of a bill endorses, and presents it for payment to the acceptors, he must be considered as representing, if not as warranting, to the acceptors, the genuineness of the endorsement of the payee, and where the payee's endorsement proves to have been forged, the acceptors, who have paid upon a false representation, however innocent, may recover the amount from the holder; and the holder will have the same remedy against his prior endorser, that the acceptors have against him.

Where a bill, on which the names of the drawer and payee are proved to be forged, is accepted and paid through error, to an endorsee who acted as agent of a prior endorser, but whose agency was not disclosed at the time, the amount of the bill having been paid by the first endorser to the forger; and it is shown that the acceptors, as soon as they ascertained the forger, communicated the fact to the holder, and demanded the return of the money, before the latter had paid it over, which was refused, and the good faith of the acceptors, the holder, and of his principal is admitted, the acceptors will be entitled to recover back the amount so paid in error. C. C. 2279, 2280, 2281, 2283.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. The facts of this case are stated in the opinion *infrâ*.

*Bradford*, for the plaintiffs.

*Grymes*, for the appellants. 1st. There was gross negligence on the part of the plaintiffs, the drawees of the bill in question, in paying the same when the signature of the drawer, their customer, was a manifest forgery. 2d. There was gross and unnecessary delay and negligence, in not discovering and communicating the fact of the forgery of the defendants, in time to enable them to preserve their remedy *on the bill*, against all antecedent parties. 3d. There was no knowledge, negligence or *laches*, nor any direct or indirect representations, or any other act on the part of the defendants calculated to lead the plaintiffs into error in regard to the payment of the bill. 4th. These facts amount in law to a complete bar to the plaintiffs action, to recover back the money paid in discharge of the bill. See Story on Bills, (last ed. 1847,) s. 451, and *note.* 6th Taunt. Rep. 76. 3d Barnes and Cress. 428. 9th Barnes and Cress. 902. 17 Mass. Rep. 1, 33. 13 Seargt. and Rawle, 318. 4 Dall. 234. 1st Binney, 27. 10th Wheaton, 333. Civ. Code, art. 2288. 2 Pardessus, 451. 4 Har. and Johns. 376. 3d Johns. Cas. 5, 259. 1st Wendell, 433. 6th Ib. 445. 6th Cowen, 484.

*Halsey*, on the same side. It is proved that the defendants' customers, *Britton* and *Co.*, took the bill from a person recommended to them by the most respectable introduction. It does not appear that either the defendants or *Britton* and *Co.* had any acquaintance with the signature of the drawer, or with that of the payees, *Pike* and *Hart;* so that they are not at all in fault, for the discovery was not in their power, and they had no reason to suspect a forgery. It is proved that plaintiffs are the factors of the drawer; that, when the bill was

presented, they neither had funds of his, nor his crop in their hands; that they had not received the letter of advice, usually preceding his drafts on them; and that the imitation of *Conrad's* signature was so bad, that any one familiar with his signature could easily have discovered the forgery. It is proved that more than a week had elapsed since the payment of the bill, when the forgery was notified to the defendants and the return of the money demanded. The plaintiffs were in fault for not discovering and giving notice of the forgery immediately. And they are without excuse, for their attention was directed to an examination of the bill, by the extraordinary circumstance attending the draft; and with their familiarity with *Conrad's* signature, they would have detected the forgery had they heeded the call for their scrutiny and examined the signature. See the cases of *Price* and *Neal,* W. Blackstone, 390. *Cocks.* v. *Masterman,* 9 Barnes and Cress, 902. *Smith* v. *Mercer,* 6 Taunton, 76. *Levy* v. *Bank of the United States,* 1 Binney, 29; and *United States Bank* v. *Bank of Georgia,* 10 Wheaton, 333.

1st. It is plain from these cases that the diligence in giving notice after the discovery of the forgery is not sufficient, there must be no delay in the discovery.

2d. Any prejudice or injury to the holder arising from the delay to give him notice of the forgery, releases him from his obligation to return the money. In the earlier cases it was held that the holder ought not to be obliged to refund under any circumstances, although he could not have enforced payment, and although he had immediate notice of the forgery, because the drawee was bound to know the hand-writing of the drawer, and, because the holder, being ignorant of the forgery, ought to have the benefit of the accident of such payment by mistake, and not be compelled to refund. The later decisions have permitted the recovery where the forgery was discovered, and notified on the day of the payment, because the holder "is enabled to proceed against all the other parties precisely the same as if the payment had not been made, and consequently the payment to him has not in the least altered his situation, nor occasioned any delay or prejudice." Chitty on Bills, pp. 462, 464. Under the modern doctrine, the holder cannot refuse to return the money, unless he has been injured by the delay to give him notice. Now, it may be said that the parties prior to these defendants are responsible to them without notice, under their guarantee of the genuineness of the bill, and as, in the cases of *Cocks* v. *Mastermann,* and *Smith* v. *Mercer,* the holder's recourse on his endorsers had been entirely destroyed by the delay, those cases are not conclusive on this, for these defendants have not lost their recourse by the delay. But none of the authorities make the loss of all remedy the only sufficient injury to constitute a defence. When Chitty, in commenting on *Smith* v. *Mercer,* remarks that Gibbs, J. was the only judge who put the case on the true ground, viz: the loss of the holder's recourse, he means the true ground as distinguished from the old doctrine taken by Dallas and Heath, J., the ground of injury by the delay, as distinguished from the doctrine of mere neglect of duty on the part of the drawee. Chitty means that the only true ground of defence is, an injury from the delay; he does not mean that the injury must be, as in that case, the loss of all remedy against the prior parties. For, as we have seen when he gives the reason for which the recovery is allowed where no delay has occurred, he says the holder "is enabled to proceed against all the other parties precisely the same as if the payment had not been made, and consequently the payment to him has not in the least altered his situation, nor occasioned any injury or prejudice." These are Chitty's expressions, and they imply clearly that if the payment has in the least altered the situation of the holder, or occasioned him any delay or prejudice, the drawee cannot recover. Now, if it be true that the defendants have a remedy against all their prior parties, it is also true that by the delay of notice of the forgery they have suffered a delay in the exercise of their remedy, and this, in the expression of Chitty, "any delay or prejudice," will prevent the drawee's recovery. The delay is sufficient without evidence of prejudice, for the law will presume an injury from the delay. "Proof of actual damage may not always be within the holder's reach, and, therefore, to confine the remedy to cases of the sort, would fall far short of the actual grievance. The law will, therefore, presume a damage, actual or potential, sufficient to repel any claim against the holder." Story, J., *United States Bank* v. *Bank of Georgia,* 10 Wheaton, 344.

If the plaintiffs had not paid the bill it would have been returned immediately to *Britton* and *Co.,* who might have recovered the amount of their endorser. *Non constat* but that he could have been made to pay had steps been immedi-

ately taken against him, and during the interval of the delay, his situation may have become worse, and perhaps such that suit had become useless. It is no answer that he was a forger, and had probably fled the country even before the draft was paid. It is a rule of commercial law, that it is no excuse for a neglect of notice to a drawer or an endorser, "that the chance of obtaining anything on their remedy over was hopeless, that the persons against whom that remedy would apply were insolvent or bankrupt, or had absconded. Parties are entitled to have the chance offered them." Chitty on Bills, p. 482. It seems clear on principle, that the same delay of notice that would discharge an endorser must release the holder, who has received payment.

3d. But it is said that this case differs from all the cases cited; that here is a forgery of the payee's signature, as well as of that of the drawer; that for the purpose of this discussion, it must be considered that the bill was a true bill; that the defendants, as well as the plaintiffs, are estopped from denying the signature of the drawer, and, if it be a true bill, that the title is in *Pike* and *Hart;* that, as in an action against the plaintiffs, as acceptors, the defendants could not have recovered for want of title, so, having received the amount without title, they must refund it.

It is true that in an action on the bill, against the acceptors as such, the proof of title by the endorsement of the payee is essential to a recovery. For though the bill be forged, such an action implies its reality. But is this implication unavoidable in a action against the acceptor of a forged bill? Where the fact is that the bill was not drawn by the drawer upon it, is the holder estopped from alleging and proving that fact? Is he limited to his action on the bill, or has he an action on the obligation of the acceptor to hold him harmless from the consequence of the acceptor's neglect?

It is said that the holder is estopped from alleging and proving the forgery of the drawer's name, by his guarantee of the genuineness of the bill; but does the holder make this guarantee to the acceptor, whose duty it is to know the signature of the drawer? Is not the holder's guarantee to the acceptor, merely of his own title to the bill? If such be the extent of his guarantee, he is not estopped by it from showing the forgery. Again, the action of the holder is put by Judge Story on this ground: " *First,* that the drawee, before he accepts, is bound, as a matter of duty, to ascertain whether the signature of the drawer is genuine or not; and next, that, where one of two innocent persons must suffer, he who has caused a misplaced confidence, or has misled another, or has omitted his duty, shall suffer rather than the other party." Story on Bills, § 411. An action not on the bill, but on the obligation flowing from the acceptor's neglect, does not imply the reality of the bill, and as there is no obligation on the part of the holder to the acceptor estopping the holder from showing the forgery, he must be permitted to prove it. Further, as it is not inconsistent with his guarantee of title to show that the payees on the bill never held it, the holder may prove that fact also. Thus, the holder can show that neither by the drawing in their favor, nor by holding the bill in ignorance of the forgery, have the payees on the bill had any title to it. And after proof of that, there is no need of evidence of a transfer of title; no need of proving the endorsement of the payees.

In this case the plaintiffs' allegations, which they are estopped from denying, are that, the bill was never drawn in favor of the payees upon it; and their evidence, which they cannot controvert, is that, the payees on it never held it. The plaintiffs have presented the fact that the payees never owned the bill; and if the action were against the plaintiffs as acceptors, they could not require proof of a transfer from the payees. All the cases of refusal of recovery, or of judgment to refund, on the ground of forgery of the payee's endorsement, are cases presenting a title in the payees. *Dick* v. *Leverich,* 11 La. 573. *Canal Bank* v. *Bank of Albany,* 1 Hill, 287.

The plaintiffs are responsible to the defendants, from their neglect in not discovering and giving notice of the forgery. This responsibility avails the defendants as a ground of defence, as it would avail them as a ground of action. Their defence is not on the bill, and there is no implication from it of the genuineness of the bill, and of a title in *Pike* and *Hart.* The forgery of the bill, and the absence of title in *Pike* and *Hart,* are presented by the plaintiffs' allegations and evidence, and hence, as there is no need of *Pike* and *Hart's* endorsement, the forgery of it is immaterial. In testing the defendants' right to retain the money, the counsel for the plaintiffs errs in the premise of his argu-

McCall
v.
Corning.

ment, the estoppel of the defendants from denying the signature of the drawer. He has assumed this premise, and in doing so he has assumed a point in controversy, whether the holder is limited to an action on the bill, or has his action on the obligation of the acceptor under his neglect.

The technical ground taken by the plaintiffs' counsel cannot prevail. Indeed, it is inconsistent with the ground of the plaintiffs' action, which is, that the money must be returned, not because it belongs to the payees, but because it does not belong to the defendants, as having been paid them in an erroneous belief that the bill had been drawn by the plaintiffs' correspondent. The forgery of the drawer's signature is the ground of their action.

The judgment of the court was pronounced by

SLIDELL, J. This is an action to recover from the defendants the amount of a bill of exchange for $2847 50, drawn in the name of *F. D. Conrad*, upon the plaintiffs, to the order of *Messrs. Pike* and *Hart*, endorsed in the name of the payees in blank; also, by *L. B. Belgrove, W. A. Britton* and *Co.*, and by *J. Corning* and *Co.* The bill was at sight, and dated at Baton Rouge, 4 Feb., 1847. It was paid by the plaintiffs to *Corning* and *Co.*, on the 12th day of Feb., 1847. The signatures of *Conrad*, and of *Pike* and *Hart*, were both forgeries.

It appears that, in 1847, a person calling himself *Belgrove*, was introduced to *Conrad*, a planter living in Louisiana, by a letter from *Henry Clay*; who stated that *Belgrove* had been introduced to him by *Abbott Lawrence*, and was desirous to obtain information in relation to the culture of sugar. Relying upon this introduction, *Conrad* entertained him at his plantation; and, while there, from a conversation between *Conrad* and a member of the firm of *Pike* and *Hart*, *Belgrove* ascertained that there were some business relations between *Conrad* and *Pike* and *Hart*, and that *McCall* and *Adams* were *Conrad's* factors. A few days afterwards *Belgrove* went to Natchez, and there, through a letter of introduction from *Mr. Clay*, obtained the acquaintance of a gentleman who introduced him to *Duncan*, a planter living in that vicinity. He stated to this person that, he wished to negotiate a draft on New Orleans, and was accompanied by him to the office of *Britton* and *Co.*, bankers, at Natchez. *Duncan* stated to *Britton* and *Co.* that *Belgrove* had brought letters from *Henry Clay*, and upon their enquiring whether the bill was all correct, replied: "I have no doubt it is." *Britton* and *Co.* then cashed the bill, and *Belgrove* left Natchez a day or two afterwards, and has not since been heard of. *Britton* and *Co.* endorsed, and have remitted the bill to the defendants, who received it on the 12th February, 1847, and having endorsed it in blank, presented it for payment by their clerk, to *Adams*, one of the plaintiffs. *Adams* said he had no advice of it, and asked the clerk to leave it; that he would see his partner, and *if it* was right, would send a check. At 3 o'clock on the same day, *Adams* bought a check of *McCall* and *Adams* for the amount, and stated that *Conrad* had no authority to draw the draft, his crop not being in hand, and that he would write him a letter censuring him. It does not appear that, in presenting, or receiving payment of the bill, *Corning* and *Co.* held themselves out as other than principals. On the 14th February, *McCall* and *Adams* wrote a letter to *Conrad* informing him that they had paid the draft. *Conrad* immediately sent a special messenger to *McCall* and *Adams*, to inform them that he had not drawn such a draft. This messenger reached New Orleans with all possible despatch, and sooner than a letter could have reached the city by mail; and, immediately upon reception of this information, to wit, on the 18th February, the plaintiff communicated it to the defendants, and asked the return of the money, which the defendants declined. The defendants gave *Britton* and *Co.* credit on account for the amount of the

draft; and subsequently, after notice of the forgery, paid it over to *Britton* and
*Co.* The forgery of both names is conclusively established. That of the
drawer bore some resemblance, it is proved, to the genuine signature of *Con-*
*rad*, but was a bad imitation. That of the first endorser bore no remblance to
to the genuine signature. The good faith of the plaintiffs, of the defendants,
and of *Britton* and *Co.* is entirely unimpeached. But it is asserted by the de-
fendants in argument, that there was, under the circumstances, gross negligence
on the part of the plaintiffs in paying the bill, and that there was also gross
and unnecessary delay and negligence in discovering and communicating the
fact of the forgery. Upon these charges, we premise that the latter appears
entirely untenable; as to the former, there seems to us to have been an over
confidence on the part of the plaintiffs, amounting perhaps to imprudence, but
not amounting to gross negligence. The indiscretion is much palliated by the
consideration that *Conrad* was not a merchant, but a planter; one of a class not
punctual in their advices. As regards the signature of the drawer, it is obvi-
ous that their suspicions were not in the least excited on that score; and it is
not shown that the relations between him and the plaintiffs had been so intimate
and so frequent, as to have given that familiarity with his signature which should
have led them to pronounce the draft a forgery.

The question presented by this case is certainly perplexing. In deciding
it we are not aided by any conclusive and direct authority, and must seek its so-
lution by the application of general principles and by a consideration of those
rules pertinent to the subject, which are peculiar to bills of exchange.

It is perhaps a safe starting point in our investigation to consider what would
have been the rights of the plaintiffs, had the forged instrument upon which
they made the payment not been a bill of exchange, but one falling within the
domain of ordinary rules. Thus let us suppose that *Belgrove* had forged an
order of *Conrad* upon *McCall* and *Adams*, his factors, to deliver to *Pike* and
*Hart*, or their order, fifty hogsheads of sugar; and had also forged the sig-
nature of *Pike* and *Hart* to a transfer of the instrument; that he had transferred
it to *Britton* and *Co.*, who, in their turn, had transferred it to *Corning* and *Co.*, and
that *Corning* and *Co.*, on presentation of the order, had received the sugar, and that,
upon discovery of the forgery, a prompt call had been made upon *Corning* and *Co.*
to restore the sugar, and they had refused—could *McCall* and *Adams* have
recovered its value from them? The prompt answer to this enquiry would
not admit of a doubt. The payment would have been made in error. They
would be considered as having made it solely upon the belief, created by the
forged order, that they were complying with the request of their principal.

"He who receives what is not due to him, whether he receives it through
error or knowingly, obliges himself to restore it to him from whom he has unduly
received it." "He who has paid through mistake," says the Code, "believing
himself a debtor, may reclaim what he has paid." "To acquire this right, it
is necessary that the thing paid be not due in any manner, either civilly or nat-
urally. A natural obligation to pay will be sufficient to prevent the recovery."
"That which has been paid in virtue of a void title is also considered as not
due." Civil Code, arts. 2279, 2280, 2281, 2283. Here all the circumstances
concur which the law requires to authorize the relief. Mistake, for *McCall*
and *Adams* believed the order genuine; an absence of all civil or natural
obligation, for their duty was only to *Conrad;* and a void title, the instrument
being forged. The articles we have cited confer a right to recover back upon

McCALL
v.
CORNING.

him who has paid ;what was not due, and impose the correllative duty on him who has unduly received to restore; and the knowledge or the ignorance, the fraud or the good faith, of the party so unduly receiving, is immaterial. The obligation rests upon that great rule of natural equity, " *Neminem cum alterius detrimento et injuria fieri locupletiorem.* It is true that the question is, which of two innocent parties is to bear the loss; but the loss had already fallen upon the holders before they presented the forged order; and they could not equitably ask to shift that loss to another, through that person's mistake. In legal contemplation *McCall* and *Adams* would be regarded as never having consented to the delivery of the property; for he does not consent who consents in error.

In the supposed case we hold it to be clear that, upon principles of natural equity, and under the express rules of law, *McCall & Adams* would be entitled to relief. And if so, it is obvious that they must be relieved in the present case, unless the peculiar nature of the transaction, as growing out of a bill of exchange, subjects them to some technical rules which forbids the application of the ordinary standards of justice and legal obligation. We think it was fairly put by the plaintiffs' counsel that, if the cause is to be withdrawn from the operation of general principles and they are subjected to the burden of technical rules, they are also entitled to the advantage of such rules.

The rule which is invoked against the plaintiffs is, that payment by the drawee admits the genuineness of the drawer's signature, and the drawee is legally estopped from disputing it. The rule, in a qualified sense, is true. The holder, it seems, is permitted to profit by the accidental payment, though the drawer's name be forged, when there has been an interval between payment and notice to him of the forgery, and his situation has been altered to his prejudice, either in fact or in legal presumption.

But, on the other hand, acceptance is not an admission of the payee's signature. Here a technical rule comes in aid of the acceptor. If sued upon his acceptance, even if estopped from disputing the signature of the drawer, he has a right to insist upon proof of the payee's signature. The very rule which concludes him as to the genuineness of the drawer's signature and supposes that signature to be genuine, places him in the attitude of one who is really ordered to pay to the payee named in the bill, or his order. How then can the holder of a bill, upon which the payee's endorsement is forged, recover from the acceptor, who can be considered only as having admitted the genuineness of the drawer's signature? Tested, therefore, by technical rules it seems to us it would be impossible to condemn *McCall & Adams*, were this a suit against them upon the bill as acceptors. An acceptance is, an engagement to pay according to *the tenor of the bill.* But the tenor of the bill was " pay to *Pike & Hart*, or their order;" and *Pike & Hart* have never ordered its payment to *Corning & Co.*

But it is said that *Pike & Hart* never had any interest in the bill, and must be regarded as fictitious payees. If they be so regarded, that still would not authorize a recovery against *McCall & Adams*, had they accepted. For the rule with regard to fictitious payees has only been carried to this extent, that the *bonâ fide* holder of such a bill, ignorant of the facts, may recover against an acceptor who knew that the payee was a fictitious person. The use of such names has been, indeed, highly censured, and an acceptance, without knowledge by the acceptor of the fictitious character of the bill, would, it seems, give no remedy and be completely void. This seems to accord with principle; for the acceptor promises to pay the payee, or his order; and if the payee has

no existence, there is no one in whose favor the promise takes effect. Hence it seems to us clear that if this forged bill had been at so many days sight, or after date, and had bean accepted by *McCall & Adams, Corning & Co.* could not have recovered on the bill.

This view of the case, their having paid a bill which they could not have been compelled by suit to pay, goes very far to show that they ought not to be estopped from recovering it back. But as, perhaps, there may be a question how far the right to resist payment in the one case, and to recover back in the other, are to be treated as identical in principle, we proceed to another view of the rights of the parties, technically considered.

When this bill was presented for payment to *McCall & Adams* by *Corning & Co.*, the names of the latter were upon it, and they were endorsers of the bill. Let it be conceded that, according to the technical rule, *McCall & Adams* are to be considered as having admitted the signature of *Conrad* and estopped themselves from denying it; was there no legal consequence flowing, on the other hand, from the endorsement of *Corning & Co.*, and the presentation of the bill for payment by them? We think there was. They are to be considered as representing at least, if not warranting, to *McCall & Adams*, that *Pike & Hart*, the persons named as payees, had negotiated the drafts—that their endorsement was genuine and true.

The case of *The East India Company* v. *Tritton*, 3 Barnwall & Creswell, 82, has been cited as authority that an endorsee does not warrant the genuineness of the prior endorsements. But what is there said cannot be regarded as authority, in the proper sense of the term. The bill had been endorsed by one *Card*, professing to act as attorney of *Hope*, the payee, but under an insufficient power of attorney. The East India Company accepted the bill, and paid it to the defendants, the holders, who had taken it from *Card's* endorsees, and subsequently sued the defendants to recover back the amount which the company had been compelled to pay a second time to *Hope's* administrator. It was found by the special verdict that, before the bill was paid, the plaintiffs took all such steps as they judged fit to satisfy themselves that the first endorsement by *Card* was made by virtue of a sufficient authority. The power was not produced by the defendants, and it did not appear that they ever saw it, or had any means whatever of forming a judgment as to its sufficiency. Abbott, C. J. notices the facts as favorable to the defendants, but puts the case, as with the defendants, upon the ground that they received the money as agents, and paid over to their principals before any discovery was made of the insufficiency of *Card's* authority; that it was unjust to call upon them to restore money no longer in their hands, and which they had not a right to withhold from their principals. Bayley, J. said, he was not prepared to admit that every endorsee warrants the genuineness of the prior endorsements; but added that it was not necessary to decide or discuss that question; that the power was shown to the plaintiffs, and it was for them to judge of the extent of the authority conferred by it. He then adopts the same ground as the chief justice, that the defendants, having received the money as agents and paid it over, it would be unjust to make them refund. Holroyd, J. thought the plaintiffs, having the means of knowledge in their power, had made a mistake of *law*, and not of fact, with regard to the power, and that, under the facts, a promise to repay, if the endorsement proved insufficient, could not be implied. Littledale, J. said, he was not aware that a warranty of the genuineness of endorsements was to be implied, but if there were such an implied warranty in ordinary cases, it was negatived there by the finding of the jury.

McCall
*v.*
Corning.

McCALL
*v.*
CORNING.

Mr. Story, in his Treatise on Bills, very clearly intimates his dissatisfaction with the *dicta* in the East India Company's case. In the text he says: "There is yet another engagement which is implied in every endorsement, on the part of the endorser. It is that the instrument which he endorses is a genuine instrument, and not forged; that the signature of the drawer, and also of the antecedent endorsers, are genuine; and that he, the endorser, has a good right to transfer the same to the immediate endorsee." Story on Bills, § 111. These expressions, it is true, point to the relation of the endorser to his endorsee; but the reason of the rule, so far at least as the warranty of the payee's endorsement is concerned, applies with equal force to the acceptor; for if the payee's endorsement be forged, the holder would be receiving a payment to which he had no right; and there is the same justice in his warranting his title to the acceptor from whom he receives payment, as to the endorsee who gives him the money upon the negotiation of the bill. In a note, Mr. Story comments upon the case of the East India Company, as not supporting the doctrine that the endorser does not warrant the genuiness of antecedent names; and cites the contrary opinion of Pardessus. See also Febrero, vol. 3, p. 350, where it is said: El portador de una letra de cambio es enteramente garante de la validacion de ella, y de todos sus endosos. See also Dalloz, 1844, part 2, p. 200. Jousse, Nouveau Commentaire sur les Ordonnances de 1669 and 1673, p. 62. Kent's Commentaries, edit. of 1844, p. 88.

Whether the endorser may be considered as warranting or not to the acceptor the genuineness of the payee's name, it is hard to conceive, at all events, how he can be considered otherwise than as representing the payee's endorsement as genuine. It is certain that, if the title to the bill has not been passed to the holder, he has no right to receive payment; and the presentation for acceptance or payment, is an implied declaration that the title is in him.

The presentment of the bill for payment by *Corning & Co.*, being an implied representation by them to *McCall & Adams*, that *Pike & Hart*, the payees named in the bill, had endorsed it, if *McCall & Adams* are to be held to the technical rule of an implied admission of the drawer's signature, they must have the benefit of the implied representation; and, having paid upon a false representation, however innocent, the money should be restored to them.

It is not admissible to say that *Corning & Co.'s* endorsement, and the implied obligation which it involved, had no effect upon *McCall & Adams*, in inducing them to pay the bill. The very fact that a house of such respectable standing presented the bill, was a circumstance which probably lessened their vigilance. If the forger, a stranger, had presented the bill, it is not at all improbable that they would have waited for advice.

It is an important feature in this case that the holders were not induced to take the bill by any act of the plaintiffs, and the case is thus relieved from any equity which might be urged, in the case of a forged bill accepted by the drawee, and going after acceptance into the hands of a *bonâ fide* holder for value.

It cannot be said that the holder loses his remedy over against his prior endorsers, by the payment of the bill to him by the drawee; if we are right in the doctrine that an endorser is to be considered as representing the genuineness of prior endorsements, then the holder has the same equity against his prior endorser as the drawee has against him.

The maxim invoked by the defendants, "In equali jure melior est conditio possidentis," is one which cannot be applied in this case, without assuming that the parties do stand in equal right. But this cannot properly be said; for here

the loss had first fallen on *Britton & Co.* without any act or fault whatever of the plaintiffs, and if there was some overconfidence or indiscretion on the part of the plaintiffs, it does not appear that the defendants were put in a worse position by the brief delay between the payment and the discovery of the forgery; and it would be going very far to say that, a simple indiscretion, not shown to have actually made the situation of the defendants, or of *Britton & Co.*, their principals, worse, should shift the loss from the party upon whom it had first fallen, to a party who paid under an evident mistake of facts, and in good faith.

The defendants had notice of the forgery, and of the plaintiffs claim upon them, before they paid over the money to *Britton & Co.*, and cannot complain that they are treated as principals. We have also seen that on the presentment and receipt of payment they did not disclose their agency.

We have considered the question presented in this cause with care on account of its commercial importance, and have not come to a conclusion without diffidence. The case is embarrassing in consequence of the double forgery of the names of the drawer and payee; and we have not the benefit of authority in point. We are clear that the cause is with the plaintiffs upon principles of natural justice, and under the ordinary rules of law; and when technical rules are invoked to break down the equity of a case, they ought to be so clearly applicable and conclusive as to leave no room for doubt.

*Judgment affirmed.*