## SECURITY STATE BANK & TRUST CO. OF BEAUMONT v. FIRST NAT. BANK OF SHREVEPORT.

### No. 6180.

Court of Appeal of Louisiana. Second Circuit.

Nov. 29, 1940.

· Robert L. Garrett, of Shreveport, for appellant:

Blanchard, Goldstein, Walker & O'Quin and Ben C. Dawkins, Jr., all of Shreveport, for appellee.

DREW, Judge.

The carefully and well-prepared opinion of the lower court correctly sets forth the issues, finds the facts and determines the case in accordance with the law applicable thereto. It is as follows:

"The Security State Bank & Trust Company of Beaumont, Texas, brings this action to recover from the First National Bank of Shreveport, Louisiana, the sum of $350.00, being the amount paid by them in error to the defendant as the drawee bank on a forged check.

"The material facts on which this action is based are not disputed. On November 30, 1938, a Mrs. L. M. Knox presented the check in question to the First National Bank of Shreveport. The check was payable to Mrs. Knox, dated November 26th and bore the signature of D. C. Nethery, being drawn on the Security State Bank & Trust Company. The check was handled by Mr. B. K. Dorman, vice president of the defendant bank, who telephoned to Beaumont and ascertained that the purported maker carried an account in plaintiff bank and that his account was sufficient to pay a check in that amount. There was some dispute as to the exact conversation between the officials of the two banks, which is immaterial to a decision of this case. The check was paid to Mrs. L. M. Knox, the payee, and in due course was presented to the plaintiff bank and honored by them. The check was not handled for collection by the First National Bank, but was cashed by them immediately, being accepted and paid by the plaintiff bank on December 2, 1938. On December 23, 1938, several forged checks were discovered in Mr. Nethery's folio, and upon investigation it was then found that the check in question was also forged. Plaintiff demanded a refund of the $350 paid by them to the First National Bank, which was refused and this suit was instituted.

"The payee of the check, Mrs. L. M. Knox, was introduced to Mr. Dorman by a well-known resident of Shreveport. During the interval between that time and the cashing of this check she had several business transactions with the First National Bank through Mr. Dorman. Because of these business connections and the cashing of several other checks for Mrs. Knox, Mr. Dorman had complete confidence in her integrity. That this confidence was misplaced was shown by the fact that Mrs. Knox was later arrested, charged and convicted on this and other charges of forgery.

"The plaintiff seeks judgment in this case and bases its right of recovery on the following grounds:

"First, that the failure of the drawee bank to detect the forgery immediately did not cause the loss, which was already occasioned by the act of defendant in cashing this check. This is based on the rule of law permitting recovery of money paid in error, under Articles 2301 and 2302 of the Revised Civil Code. Second, that the holder and forwarding bank was negligent in accepting the check from the forger and that plaintiff was lulled into a sense of security by the actions and endorsement of the defendant. Third, that the defendant through its vice president, on being informed of this error, promised to refund the money received by them.

"The defendant denies any negligence in the handling of this check and alleges that the plaintiff's loss was caused by their own negligence in not discovering the forgery prior to payment. The defendant further contends that under the Negotiable Instrument Law the liability must fall on the drawee and that they are relieved of any liability by their endorsement to a drawee bank under this statute. The defendant further denies any promise to refund the money received by it and that if such a promise was made it was without authority and not binding on the defendant bank.

"In addition to the Articles of the Civil Code heretofore mentioned, the plaintiff cites and relies on the following decisions by the Louisiana Supreme Court as being authority for its right to recover in this case: McKleroy & Bradford v. Southern Bank of Kentucky, 14 La.Ann. 458 [74 Am. Dec. 438]; Louisiana State Bank v. Hibernia Bank & Germania National Bank, 26 La.Ann. 399; and the early case of McCall et al. v. Corning et al., 3 La.Ann. 409 [48 Am.Dec. 454].

"As against these authorities, the defendant relies on the case of Howard & Preston v. Mississippi Valley Bank of Vicksburg, 28 La.Ann. 727 [26 Am.Rep. 105], and the provisions of the Negotiable Instrument Act, being Act 64 of 1904, as authority for the proposition that a drawee bank cannot recover a payment made to a holder on a forged instrument where the drawer's signature is forged and the holder is free from fault.

"The plaintiff relies largely on the case of McKleroy & Bradford v. Southern Bank of Kentucky, supra. In that case the plaintiffs were cotton factors of a Mr. James Smith, of Arkansas. A discharged employee of Smith forged a draft drawn on the plaintiffs in the sum of $986. Through a forged letter of introduction and posing as John Belmont, he secured the endorsement of Shotwell & Son of Louisville, Kentucky, to the draft which was then presented for discount to the defendant, Southern Bank of Kentucky, and purchased by them. The draft was remitted to the Louisiana State Bank and after being endorsed by them, was presented to the plaintiffs for acceptance. The draft was due December 15th and was accepted on December 1st. It was paid by plaintiffs to the defendant bank on December 18th. The forgery was discovered about January 9th of the next year and plaintiff immediately notified A. L. Shotwell & Son, Southern Bank of Kentucky and the Louisiana State Bank. The Southern Bank of Kentucky was the only defendant before the court and was undoubtedly free from any fault. We quote herewith portions of this opinion:

"'The defendant purchased the bill on the faith of the endorsement of Shotwell & Son, which was a warranty of the genuineness of the drawer's signature to the bank; and there is no good reason, why the accidental payment made by the plaintiffs should inure to the benefit of the defendant.

*    *    *    *    *

"'The loss had already attached, before the bill was either accepted or paid, and the acceptors gave immediate notice to the defendant, and Shotwell & Son, after ascertaining for the first time, from James Smith, in whose name the bill was drawn, the fact of forgery.'

"The court, in awarding plaintiff judgment in this case, based its decision entirely

on the authority of Chitty on Bills, 464. After quoting at length from this authority, the court said: 'No authority applicable to the particular circumstances of this case has been cited by the defendant's counsel, and we have no hesitation in reversing the judgment upon the authority of Mr. Chitty, above quoted.'

"The case of Louisiana State Bank v. Hibernia Bank & Germania National Bank, supra, cites the McKleroy case with approval. Here the plaintiff bank had an account opened in the name of Clayton, Williams & Company with a cash deposit. One week later two large deposits of checks were made and on the same date the plaintiff bank cashed a check for $5,000. Later in the day another check for $10,000 was tendered and plaintiff requested that its depositor come back on Monday. Immediately thereafter they sent an employee to the defendant and other banks and had the checks certified that had been deposited earlier in the day. Shortly thereafter the forgeries were discovered by the defendant banks. Fortunately, the plaintiff depositor did not return or else the $10,000 check would have been cashed. Plaintiff brought this suit to recover loss occasioned by their paying their own customer's check for $5,000, which loss, after deducting the cash deposited, amounted to $4,685.40. In rejecting the plaintiff's demands, the court said:

" 'This case is like that of McKleroy & Bradford v. Southern Bank of Kentucky, 14 La.Ann. 458 (74 Am.Dec. 438), and must be controlled by it. There the holder before acceptance of the forged bill, was promptly notified of the forgery as soon as it was discovered by the drawees, which was twenty-two days after acceptance and payment. Here the holder of the forged check was promptly notified of the forgery and within six hours after the certification.

\* \* \* · \* \* \*

" 'If the advance had been made to Clayton, Williams & Company after the certification of the checks, or if the plaintiff had parted with its money in consequence thereof, there would be no doubt as to the liability of the defendant. But the truth is, the plaintiff paid out its money on the faith of the deposit of the forged checks at least one hour and a half before the defendants gave the certification, or even had knowledge of the existence of the forged checks.

" 'In our opinion the plaintiff ought not to recover, because the loss of which it complains was incurred before the certification of the checks by the defendants, and not in consequence thereof.'

"The earliest Louisiana case to which we have been cited is McCall et al. v. Corning et al., 3 La.Ann. 409 [48 Am.Dec. 454]. In that case Britton & Company of Natchez, Mississippi, cashed a draft payable to Pike & Hart purporting to be drawn by F. D. Conrad upon the plaintiffs, McCall & Adams, who were Conrad's factors. The forger was identified to Britton & Company as L. B. Belgrove. It was endorsed by the payee, L. B. Belgrove, Britton & Company and J. Corning & Company. Having been forwarded to J. Corning & Company, they presented the bill which was a sight draft dated February 4th to the plaintiff. It was paid by McCall & Adams on February 12th and on the 14th they notified Conrad of the payment. On the 18th, they were advised of the forgery by Conrad and immediately called on Corning & Company for a return of the money, which was refused. The forgery of the drawer and payee's names was established. While there are some differences in the facts of this case and the one now presented to the court, the principles of law stated in this decision are very persuasive in deciding the question now before the court. The court in sustaining the judgment for the plaintiff, said, in part:

" 'It is true that the question is, which of two innocent parties is to bear the loss; but the loss had already fallen upon the holders before they presented the forged order; and they could not equitably ask to shift that loss to another, through that person's mistake. In legal contemplation McCall and Adams would be regarded as never having consented to the delivery of the property; for he does not consent who consents in error.

\* \* \* \* \* \*

" 'It is not admissible to say that Corning & Company's endorsement, and the implied obligation which it involved, had no effect upon McCall & Adams, in inducing them to pay the bill. The very fact that a house of such respectable standing presented the bill, was a circumstance which probably lessened their vigilance. If the forger, a stranger, had presented the bill, it is not at all improbable that they would have waited for advice.

" 'It is an important feature in this case that the holders were not induced to take the bill by any act of the plaintiffs, and the case is thus relieved from any equity which might be urged, in the case of a forged bill accepted by the drawee, and going after acceptance into the hands of a bona fide holder for value.

\* \* \* \* \* \*

" 'It does not appear that the defendants were put in a worse position by the brief delay between the payment and the discovery of the forgery.

\* \* \* \* \* \*

" 'We have considered the question presented in this cause with care on account of its commercial importance, and have not come to a conclusion without diffidence. \* \* \* We are clear that the cause is with the plaintiffs upon principles of natural justice, and under the ordinary rules of law.'

"The only Louisiana case relied upon by the defendants herein is the case of Howard & Preston v. Mississippi Valley Bank of Vicksburg, 28 La.Ann. 727 [26 Am. Rep. 105]. This also was a suit by the drawee to recover from the bank that cashed the drafts for the forger. In denying recovery, the court pointed out that the instruments were entered for collection by the defendant, which clearly distinguishes this case from the other Louisiana decisions and the case now before the court. In the cited case the court, in part, said:

" 'Seven drafts of this character, which proved to be forgeries, amounting to $1666, were discounted by the Valley Bank and forwarded by the bank to New Orleans for collection, and they were paid by the drawees on presentation.

\* \* \* \* \* \*

" 'The facts of this case seem to be materially different from those in McCall v. Corning, [supra]. There the court said that "it is an important feature in this case that the holders were not induced to take the bill by any acts of the plaintiffs," etc.'

■ "We are satisfied that under the decisions of our court in the McKleroy, Louisiana State Bank and McCall cases cited herein, the plaintiff would be entitled to recover the amount paid by it to the First National Bank unless the provisions of the Negotiable Instrument Law have changed the rule in this respect. The pertinent provisions of the Negotiable Instrument Law to be considered in this connection are the following:

" 'The acceptor by accepting the instrument engages that he will pay it according to the tenor of his acceptance; and admits,—

" '1. The existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument; and

" '2. The existence of the payee and his then capacity to indorse.' Section 62 of Act 64 of 1904.

" 'A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise provided, the provisions of this act applicable to a bill of exchange payable on demand apply to a check.' Section 185 of Act 64 of 1904.

" 'Where the holder of a check procures it to be accepted or certified the drawer and all indorsers are discharged from liability thereon.' Section 188 of Act 64 of 1904.

" 'In this act unless the context otherwise requires,

" ' "Acceptance" means an acceptance completed by delivery or notification. \* \*

" ' "Delivery" means transfer of possession, actual or constructive, from one person to another.' Section 191 of Act 64 of 1904.

"Our appellate courts have never had occasion to apply the sections above quoted to a question such as is presented in this case.

"We are satisfied that prior to the Negotiable Instrument Law the weight of authority was to the effect that as between equally innocent persons, the drawee who pays a check on which the drawer's name has been forged cannot recover the amount paid after a discovery of the forgery. This was the conclusion reached by the U. S. Supreme Court in the case of United States of America v. Chase National Bank, 252 U.S. 485 [40 S.Ct. 361], 64 L.Ed. 675 [10 A.L.R. 1401]. The doctrine expressed by the U. S. Supreme Court in this case was first announced in the English case of Price v. Neal, 3 Burr. 1354, 97 Eng.Reprint, 811, L.W.Bl. 390, 96 Eng.Reprint, 221, which was decided by Lord Mansfield in 1762. The case of Price v. Neal was accepted as a part of the law merchant of England, and while it was recognized and followed by most of the courts of this country, the rule was criticized by textwriters

and rejected by some of the courts. And while our Supreme Court has never rejected the rule, the decisions which we have heretofore cited are contrary to its doctrine.

"There are many authorities cited in 12 A.L.R. 1114, 71 A.L.R. 344, and 121 A.L.R. 1062, as to the application of the Negotiable Instrument Law to the questions now presented to the court.

"This statement is found in 12 A.L.R. 1114, in summing up the effect of the Negotiable Instrument Law: 'The Negotiable Instruments Acts have been held to adopt the rule that the drawee cannot recover from the innocent holder, and some few cases have denied recovery when, perhaps, under the former law, recovery might have been had, because of negligence on the part of the cashing bank.'

"The Supreme Court of Oregon in the case of First National Bank of Portland v. United States National Bank of Portland [100 Or. 264], 197 P. 547, 552, 14 A.L.R. 479, in a most thorough and exhaustive opinion reviewed the authorities on this question. In the course of this opinion, the court said: 'It will be observed that in section 7854, Or. L., the word "accepting" and not the word "paying" is employed in the statute; and yet in all the states where the question has been presented, except the state of Pennsylvania, where a different course of legislation has produced a different result, and except in South Dakota (Crawford's Ann.Neg.Inst. Law [4th Ed.] 121; Brannan's Neg.Inst. Law [3d Ed.] 229, 231), the courts have ruled that section 62 is merely a legislative affirmation of the rule announced in Price v. Neal, and that this section includes the payment as well as the acceptance of a negotiable instrument on the theory that the section was intended as a legislative adoption of the entire doctrine of Price v. Neal. This is the view expressed by this court in First National Bank v. Bank of Cottage Grove, 59 Or. 388, 396, 117 P. 293, now a leading authority upon this point; and the conclusion reached by this court is concurred in by other courts and text-writers. National Bank v. First Nat. Bank, 141 Mo.App. 719, 125 S.W. 513; National Bank v. Mechanics' American Nat. Bank, 148 Mo.App. 1, 127 S.W. 429; State Nat. Bank v. Bank of Magdalena, 21 N.M. 653, 157 P. 498, L.R.A.1916E, 1296 [14 N.C.C.A. 567]; Cherokee Nat. Bank v. Union Trust Co., 33 Okl. 342, 125

P. 464; Figuers v. Fly, 137 Tenn. 358, 193 S.W. 117. See, also, Title Guarantee & Trust Co. v. Haven, 126 App.Div. 802, 111 N.Y.S. [305], 306; Bergstrom v. Ritz-Carlton Restaurant & Hotel Co., 171 App. Div. 776, 157 N.Y.S. 959; Title Guarantee & Tr. Co. v. Haven, 196 N.Y. 487, 89 N.E. 1082, 1085, 25 L.R.A. (N.S.), 1308, 17 Ann. Cas. 1131; Farmers' & M. Bank v. Bank of Rutherford, 115 Tenn. 64, 88 S.W. 939, 112 Am.St.Rep. 817; Brannan's Neg.Inst. Law (3d Ed.) 229; 5 R.C.L. 552, 8 C.J. 608.'

"To the same effect are the following citations given in the A.L.R. citations, supra: Cherokee Nat. Bank v. Union Trust Co., 33 Okl. 342, 125 P. 464; United States v. Bank of New York [2 Cir.], 219 F. 648, 134 C.C.A. 579, L.R.A.1915D, 797; Bank of Montreal v. Rex, 38 Can.S.C. 258; Nat. Bank v. Farmers & M. Bank, 87 Neb. 841, 128 N.W. 522; Security Commercial & Sav. Bank v. Southern Trust & C. Bank, 74 Cal.App. 734, 241 P. 945; Fidelity & Cas. Co. of New York v. J. Planenscheck, 200 Wis. 304, 227 N.W. 387, 71 A.L.R. 331.

"The greater includes the lesser and certainly where the drawee bank received the check purporting to be issued by their depositor and pays the same, they have more than made an acceptance. They have definitely once and for all retired that instrument from commerce. Under Section 62 of the Negotiable Instrument Law, the drawee by his acceptance warranted the genuineness of the signature of the drawer, and Section 188 provides that all endorsers are relieved from liability thereby. That the act of receiving the said check and cashing the same amounts to an acceptance is clearly shown by a reference to the definition of acceptance in Section 191 of said Act.

"'"Acceptance" means an acceptance completed by delivery or notification. * * *

"'"Delivery" means transfer of possession, actual or constructive, from one person to another.'

"It is therefore our conclusion that the provisions of Act 64 of 1904 are applicable to this case and constitute an exception under our law to the right granted to recover money paid through error or mistake.

"We are not unmindful in reaching this conclusion of the number of cases cited by plaintiff in a most exhaustive brief. They are not reviewed herein for the rea-

son that they do not consider the effect of the Negotiable Instrument Law on this question. The ones cited are in accord with the jurisprudence in Louisiana prior to the enactment of the Negotiable Instrument Law. The general rule is accurately stated in American Jurisprudence, Vol. 7, Section 576, pp. 414, 415, 416, as follows:

" 'The rule has been established beyond dispute that a drawee of a check upon which the signature of the drawer is forged cannot recover the amount paid thereon to a bona fide holder for a valuable consideration who is without fault in taking or negotiating the paper. In other words, as between equally innocent persons, the drawee who pays money on a check, the signature of which is forged, cannot recover the money from the one who received it. This rule is based upon the presumed negligence of the drawee bank in failing to meet its obligation to know the signature of the drawer. This is the rule under the Uniform Negotiable Instrument Act, as well as under the law merchant. It is to be observed that the general rule allowing a recovery for payments made by mistake does not apply. Nor is there anything inequitable in such a result. If the check comes to the drawee bank in the regular course of business, and the bank, having the opportunity of ascertaining its character, pronounces it valid and pays it, it is not only a question of payment under mistake, but payment in neglect of the duty which the commercial law places upon the bank, and the result of its negligence must, in the absence of other circumstances, rest upon it.

" 'Considerations of convenience and public policy imperatively demand and require this rule denying to the drawee bank the right to recover a payment made on a forged check to an innocent person. Policy requires that as between the drawee and the innocent holders, there must be a fixed and definite time and place to adjust, correct and settle, once and for all, all prior forgeries and mistakes, and that the place should be the drawee bank and the time the date of payment; if it is not due, then, the failure to do so must be deemed the constructive fault of the drawee bank, which must take the consequences. Conditions would be intolerable if the retiring of commercial paper though its. payment by the drawee did not close the transaction, but it was possible at an indefinite time in the future to reopen the matter and recover the money if the paper proved to have been forged. The bank has the means in its own hands of protecting itself against impositions and forgeries, and it is bound to know the signature of the drawer of checks drawn against it.'

▮ "The next question presented is the effect of negligence on the part of the holder of said check or the forwarding bank prior to the acceptance and payment by the drawee.

"Plaintiff alleges that the defendant herein was negligent in not properly investigating the payee and forger of the check; that their acts lulled this plaintiff into a sense of security and that therefore they should recover. Without reviewing the various authorities, it is sufficient to say that in those states following the doctrine of Price v. Neal prior to and subsequent to the Negotiable Instrument Law, practically all hold that where there is negligence or bad faith on the part of the holder of the check or bill of exchange, an innocent drawee can recover. Certainly, there is nothing in this law that would excuse negligence, and therefore if negligence is proven and the drawee is free from fault, the plaintiff should recover judgment.

"The payee of this check, Mrs. L. M. Knox, was introduced to Mr. Dorman of the defendant bank 'some eight months prior to the forgery by Mr. E. H. Vordenbaumen, a lifelong resident of the city of Shreveport. Subsequently she placed oil and gas leases in the custody of the bank to be delivered on the payment of certain amounts by Mr. Vordenbaumen. Mr. Dorman testified that he had cashed several checks for Mrs. Knox. In that connection, Mr. Dorman testified as follows:

" 'A. Yes, she had been in there a number of times and I had cashed checks for her. It seems that whenever she would be in Shreveport and had a check here, she would bring it to the bank to have it cashed. We invariably telephoned the bank on which it was drawn and on being told the funds were there, we cashed the check for her.

" 'Q. Those checks were all paid? A. All were paid.

" 'Q. Did you deliver any other monies to her in any way? A. Yes, we did make a payment to her. Between the time the first escrow was left and the time this $350.00 check was cashed, which is the subject of this suit, I had cashed a check for her for $200.00, drawn on the First National

479

Bank of San Augustine. We had telephoned on that check and the bank told us it was good, and a few days after that, while I was absent from the bank, a gentleman came in and asked for me. On being told I was not there, he left some money, stating that we had cashed a check for Mrs. Knox and she had directed him to bring the money there because she had heard the check was going to be turned down and sent back. That she would send the balance of the money or bring the balance the next day. Within two or three days, I do not recall how long exactly, the balance was brought into the bank during my absence and, as I understand from employees of the bank, by some individual who was not known to them; the full amount of the check, $200.00. Then I wrote Mrs. Knox that we had the money but the check had not been turned down, the check had been honored, and asked for disposition of the money. She replied that she would get it when she was next in Shreveport. We delivered to her a cashier's check to her order for the amount of that money which had been left. That is the only payment which I made her except for checks which were cashed.'

"We do not have in this case an instance of the payee's signature being forged, the name of a fictitious payee being used, or the case of a bank cashing a check for an absolute stranger with no identification. On the contrary, the payee was known and was the person whom she purported to be.

■ "Plaintiff next contends that they were misled and lulled into a sense of security by the actions of Mr. Dorman in stating that the payee was a customer of the bank. We are not certain from the testimony that Mr. Dorman made this statement, but even if he did make it, it was in a sense correct. Mrs. Knox had placed oil and gas leases in the trust department of the defendant bank and had paid fees to the defendant for that service. At least, in a restricted sense, this made her a customer of the defendant bank.

■ "Nor do we think the plaintiff was misled by the endorsement of the defendant on this check. Such endorsements do not constitute a guaranty to the drawee of such instruments. This is a guaranty to subsequent holders, but it is definitely stated in the Negotiable Instrument Law and by decisions that a drawee receives no warranty from the endorsement of a holder. A drawee is not a holder in due course.

" 'An indorser of negotiable paper does not warrant to the drawee the genuineness of the maker's signature, but such warranty only extends to subsequent holders in due course of trade.' Farmers' & Merchants' Bank v. Bank of Rutherford [115 Tenn. 64], 88 S.W. 939 [112 Am.St.Rep. 817]. Also see sections 62, 63 and 65 of the Negotiable Instrument Law.

"Neither does the testimony in this case show that the plaintiff herein relied on the endorsement of the First National Bank. Mr. Fullen, vice president of plaintiff bank, testified that the endorsement probably caused the bookkeeper to relax his vigilance. There is no evidence in this record that he even looked at the endorsement of this defendant.

■ "The third ground for recovery relied on by plaintiff is the alleged promise made by Mr. Dorman to Mr. Fullen to refund the money to the Beaumont bank. This is alleged to have occurred during a telephone conversation between Mr. Fullen and Mr. Dorman on Christmas Eve following the discovery of the forgery on December 23, 1938.

"We have no doubt that Mr. Fullen considered understood from the conversation that the First National Bank would refund them the $350. There is also no doubt in our mind that there was no intention on the part of Mr. Dorman to make such a promise or to obligate the First National Bank to that obligation. Mr. Dorman still had confidence in Mrs. Knox and too, he thought that the forgery bond carried by his bank covered such a case as this, in the event it was a forgery. At that time Mr. Dorman did not think that the check was forged. In asking plaintiff to forward an affidavit of Mr. D. C. Nethery that the check was a forgery, he testified that he thought he made himself clear that it was for the usual requirement of the bonding company and for their benefit, having informed Mr. Fullen that they carried a forgery bond.

"In view of the conflicting testimony of these two witnesses of unquestioned integrity, we must hold that the plaintiff has failed to establish the contract or promise by a preponderance of the testimony.

"It is our conclusion, therefore, that in the absence of negligence or bad faith on the part of the holder of a check or bill of

exchange, a drawee bank will not be permitted to recover from the holder a payment made thereon in error because of the forgery of the drawer's name under the provisions of the Negotiable Instrument Law, being Act 64 of the Louisiana Legislature of 1904. The provisions of this law creating, in effect, an exception to the general provisions of Articles 2301 and 2302 of the Revised Civil Code providing for the recovery of a payment made by mistake or through error.

"For the reasons assigned in this opinion, there should be judgment rejecting the demands of the plaintiff, at its cost."

There is little if any improvement to be made in the above opinion, however, we wish to add to the authorities cited by the lower court, the following:

In Restatement of the Law, under the title Restitution, Section 30, we find the following:

"Forged Signature. The holder of a bill of exchange or promissory note who has received payment thereof from one whose name was forged thereon as a party, or from a drawee on a bill on which the drawer's name was forged, is not thereby under a duty of restitution if he paid value and received payment without reason to know that the signature was forged.

"Comment:

"(a) The rule stated in this section is in accord with mercantile convenience, supporting the finality of transactions with mercantile instruments in situations where ordinarily it is reasonably possible for the payor to ascertain the fraud. Furthermore, the payee has surrendered the instrument.

"The rule applies where the maker, drawer, acceptor or endorser of a note or bill of exchange, mistakenly believing that his name thereon is his genuine signature, pays the holder. The rule also applies where the holder of a bill of exchange on which the name of the drawer is forged receives payment from the drawee, with or without prior acceptance and irrespective of whether the holder became such before or after acceptance. It is applicable also to the case where both the name of the drawer or maker and the name of the payee are forged by the same person (see also Comment (a) on Section 35)."

If the court had followed the rule laid down by this court in interpreting the Ne-

gotiable Instrument Law in the case of First National Bank v. Cross & Napper, 157 So. 636, 640, much of its labor would have been eliminated. In that case we said:

"The courts of this state have held to the view that the mere crediting of the account of the maker does not transfer ownership where the bank reserves the right to charge back to the maker if not paid, as a great many of the other state courts have held, and as cited in Brannan's Negotiable Instruments Law, above quoted. See Hall, Inc. v. Farmers' Tr. & Sav. Bank of Lockport et al., 177 La. 659, 148 So. 909; First National Bank of Shreveport v. Capital City Pet. Products Co., 13 La.App. 498, 124 So. 849, 128 So. 903; Holmes & Barnes v. Shawnee Milling Co., 5 La.App. [391], 392.

"This being true, we would ordinarily feel bound to follow the decisions of our own state courts but for the fact that the very purpose of adopting the Negotiable Instruments Law by the different states of the Union, as was done in Louisiana by Act No. 64 of 1904, in the District of Columbia and in all other states of the Union, was to have a uniform law in all states affecting negotiable commercial paper. Even though the acts adopted in all the states and the District of Columbia are identical, or almost so, the interpretation by the different state courts has not been the same, no doubt due, to a great extent, to a great many cases having been decided without reference to the Negotiable Instruments Law.

"There is apparently no conflict in the decisions of the federal courts since the Supreme Court spoke in the Douglas Case [Douglas v. Federal Reserve Bank, 271 U.S. 489, 46 S.Ct. 554, 70 L.Ed. 1051], above quoted from. If all the state courts would follow the Supreme Court of the United States in its interpretation of the Negotiable Instruments Law, in so far as it has spoken, there would be no confusion and the Negotiable Instruments Law would serve the purpose for which it was intended when it was enacted in all the states of the Union and the District of Columbia.

"We therefore find that, when defendant deposited the draft in question with the Bank of Simsboro and received credit for same, with no restrictions against checking against said draft, the Bank of Simsboro became the owner of the draft for value, notwithstanding it reserved the right

to charge the amount back to defendant if the draft was returned unpaid. Negotiable Instruments Law, Act No. 64 of 1904, §§ 25 and 26."

The Supreme Court undoubtedly gave its approval to the above rule for it refused a writ in the case, although we had refused to follow a late decision rendered by that court, as well as two other decisions of the appellate courts of this State.

The decisions of the United States Supreme Court are in accord with the finding of the lower court, United States v. Chase National Bank, 252 U.S. 485, 40 S.Ct. 361, 64 L.Ed. 675, 10 A.L.R. 1401, and cases cited therein.

It therefore follows that the judgment of the lower court is affirmed, with costs.